[Civ. No. 14717. Second Dist., Div. Two. July 10, 1945.]

HOLLYWOOD STATE BANK (a State Banking Corporation), Appellant, v. WILLIAM H. WILDE et al., Respondents.

(And Consolidated Cases.)

Fred Aberle, Walter G. Danielson and Richard H. Forster for Appellant.

G. L. Aynesworth and Irvine P. Aten for Respondents.

MOORE, P. J.—These actions were consolidated for trial. They had been instituted for the purpose of enforcing the payment of the balance of a $20,000 promissory note of the Chapman Chinchilla Sales Company, hereinafter referred to as the "Company," which had pledged to plaintiff certain contracts executed severally by respondents for the purchase of chinchillas. The defendants prevailed below upon the defenses that the contracts and their assignments were void in that they were made and assigned in violation of the Corporate Securities Act and of the federal Securities Act of 1933. On this appeal by the bank from the consolidated judgment we are to determine whether the evidence justifies the findings and the judgment. A recital of a portion of the findings will serve to demonstrate the nature of the contracts and the justice of the court's conclusions.

### THE FACTS FOUND

The company is a Nevada corporation which operated in some twenty-eight states of the union. A number of its officers participated in the organization of another corporation under the laws of Delaware, to wit, National Chinchilla Breeders of America, Incorporated, hereinafter referred to as the "Breeders," and they continued to act as directors thereof. The

breeders authorized the company to act as its sales agent. The latter trained some of its employees experienced in the industry to negotiate sales of chinchillas and others to manage fur farms on which the animals were raised. Both corporations cooperated in the development of such farms and in the creation of pooling agreements among the buyers of chinchillas. The sales company trained its large selling force in a uniform method of presenting inducements to investors. The salesman was equipped with blank forms for the purchaser to sign whereby the latter agreed to purchase chinchillas at $3,200 a pair and to register its progeny with a breeders' association. Each salesman carried also application blanks for membership in the breeders and was instructed to solicit membership therein by causing the buyer to execute such application and to advise the purchaser that the breeders was the only association in which registration could be made or pedigree kept and that upon payment of $5.00 for a membership his application would go forward with the contract of purchase. The investor was told that the company was the exclusive agent of the breeders for the purchase as well as the sale of chinchillas and their pelts and that the company had exclusive control of the chinchilla market in the United States and Canada. The salesman demonstrated, by a clocklike diagram called the ''Chinchilla Dollar,'' the distribution of the $3,200 received for each pair, according to which diagram such distribution was for the common benefit of the company, the breeders, and the investor. Pursuant to instructions he represented that it was better for a person to pay only one-half of the price and to pay the remaining $1,600 by delivery of a pair of the offspring to the company; that owners could not sell the animals or their pelts to outsiders except through the sales company; that the two corporations would determine and control the quality and quantity of the animals and the prices to be obtained; that such over-all control by the company was essential to a sound and profitable investment; that it would be unnecessary for investors to give personal attention to the housing, feeding and caring for the chinchillas because (1) the company mantained a service department with research laboratory and (2) the animals could be placed on farms and be cared for at a monthly charge of $5.00 a pair and that investors would enjoy large profits from the work of the company.

In purchasing their chinchillas respondents severally be-

lieved that the two corporations would by their own efforts make the investments safe without the application of effort by the investors, who were engaged in other and diverse occupations and none of whom had any knowledge of handling or selling chinchillas. The company knew that respondents relied for their profits upon the company's skill and experience, and its officials knew that the company's campaign for the sales of chinchillas was in violation of California's Corporate Securities Act (Stats. 1917, p. 673, as amended; 2 Deering's General Laws, Act 3814, p. 1418) and of the federal "Securities Act of 1933" (15 U.S.C.A. §§ 77a, 77e), since they had not procured a permit from California or filed with the Securities and Exchange Commission the statement required by the federal statute. At the same time respondents relied upon their assumption that the company had complied with the law.

## Conclusions Were Unavoidable

■ From the facts found it is readily apparent that the investor in chinchillas did not rely alone upon the processes of nature to enrich him. He reckoned upon sharing in profits to be earned by an intelligent, experienced and industrious organization in the care, breeding and sales of the rodents. The company candidly represented that it was selling its ingenious services along with the chinchillas and it promised to invest the moneys received according to the "Chinchilla Dollar." Therefore it was not an investment in the animals only but in a service as well. It was the acquisition of the right to participate in an enterprise for the growing and selling of the animals and their pelts that induced respondents to execute the contracts in question. By making such investments respondents had no thought but that they would profit by the combined and organized efforts of the two corporations with the cooperation of all chinchilla owners.

The established facts left no alternative for the trial court other than to hold that the contracts were securities. The inducements offered by the company—of a controlled market, of a unified sales agency, and of the services of both of the interlocking corporations in achieving these ends—gave character to the investment. The national control of the industry as argued by the salesmen, the availability of the fur farms where all chinchillas would be kept, the sales of all animals and pelts by the company as against the helplessness of a lone investor without a farm, without skill in rearing the rodents,

without experience in preparing and marketing pelts or in selling the animals—these facts induce the inference that the most ordinary variety of intelligence and caution would have required a buyer to leave the future care of his animals and the potential profits from their increase to the company, which gained by the sale of the progeny of the animals sold to investors.

### The Law Applicable

That the contracts pledged to appellant are void has been established by both state and federal courts. (*Securities and Exchange Com.* v. *Payne*, 35 F.Supp. 873; *Securities and Exchange Com.* v. *Bailey*, 41 F.Supp. 647; *Penfield Co. of Cal.* v. *Securities and Exchange Com.*, 143 F.2d 746; *Atherton* v. *United States*, 128 Fed.2d 463; *People* v. *Yant*, 26 Cal.App.2d 725, 735 [80 P.2d 506]; *People* v. *Davenport*, 13 Cal.2d 681 [91 P.2d 892]; *People* v. *Jackson*, 24 Cal.App.2d 182 [74 P.2d 1085]; *Moore* v. *Stella*, 52 Cal.App.2d 766 [127 P.2d 300].) These cases are all apropos and illustrative of the application of the law.

The facts of the Payne case are quite similar to those in the cases at bar. In purchasing fifty pairs of silver foxes from the Garveys, Payne agreed that they should remain in the possession of the vendors who should ranch them for five years for an agreed price per pair. The foxes were identified and conveyed by bill of sale and Payne was supplied with the numbers of the pens enclosing them. The vendors guaranteed an annual increase of three pups per pair and losses on any account within the year after purchase of breeding foxes to be replaced. Subsequently Payne actually sold many animals under similar contracts. But after citing section 2 (1) of the Securities Act of 1933 and quoting a case from the Seventh Circuit Court of Appeals the court said that it is "controlled by an act of Congress which is intended to prevent overreaching and to mandate fair disclosure"; that "to determine whether a transaction involved is a security the real nature of the transaction is the controlling element . . . that what was designated as a sale of foxes was nothing more or less than an investment . . . and that the contracts between the so-called seller and the so-called buyer were and are securities as defined by the Act."

The Bailey case arose out of selling small tracts of two and one-half, five or ten acres of land in Florida to be planted in

tung trees for the production of oil. The selling corporation and the farming corporation had interlocking directorates. "The overwhelming percentage of purchasers are persons wholly inexperienced in tung tree cultivation, who live at a great distance from these lands, and who have no intention of occupying the same . . . but who are attracted thereto solely by the income to be derived. . . ." Therefore, concluded the court, "these transactions constitute investment contracts within the meaning of the Securities Act."

In the Yant case it was represented to investors in small tracts of land that the entire tract would be leased by Yant's corporation for a monthly rental and that the investor could join in a community lease and receive a pro rata share in the oil production. It was found from the evidence that the purpose of the vendor was to sell an interest in oil that might be produced upon the land, that no profits were ever to be received by the investors on account of anything done by them but only from the work of those who took a community lease, and that therefore the transactions were in violation of the Corporate Securities Act. The case demonstrates how the substance and not merely the form of a transaction constitutes the proper test for determining its real character. The Jackson case is equally illuminative. While the offenders sold and conveyed parcels of land the "mineral deeds" issued were in reality "certificates of interest in oil titles."

### THE PROOF SUPPORTS THE FINDINGS

The court's findings are abundantly fortified by the evidence. Mr. Carlson testified that the salesman who contacted him stated that the payment of $1,600 should be made in cash, the balance to be paid by returning a pair of chinchillas when his pair should have quadrupled; that the breeders and the company had complete control of the industry; that they worked cooperatively and jointly in the control of the price, in the registry of the chinchillas and in making all sales through the company. Whenever he should have any for sale the company would purchase them for $1,600, sell them for $3,200 and disburse the profit in the manner indicated by the "Chinchilla Dollar" which he then exhibited. The salesman displayed a folder provided by the company by which it was demonstrated that, based upon past experience in the increase of the rodents, the sales value of the progeny of three pairs would amount to $100,000 at the end of seven years. He ex-

plained that they had ranches where chinchillas would be kept in pools, one of which a buyer must join and at the same time subscribe to a ranching agreement. When Carlson explained that he was a practicing lawyer and could not care for chinchillas, the salesman assured him that his animals would all be taken care of by the breeders, the sales company and the various ranches for the service fee of $5.00 a month per pair. Before Carlson signed the contract of purchase it was explained that it was necessary to become a member of the breeders because the two corporations had control of the industry, which was necessary to maintain the price. Also, the salesman had him sign a pooling agreement, of which pool the same salesman, W. E. Wright, was manager.

Mr. Wright testified that he had received instructions at the company's office from Mr. Prestwich, the general sales manager, and had used the forms for sales contracts, for application for membership in breeders, pooling contracts and other materials furnished by the company in his sales talks. Mr. Wright in general confirmed all of the testimony of Mr. Carlson and emphasized that he did not wish anyone to invest unless he would be protected by the breeders which had authorized the company exclusively to make the sales of the animals.

Substantially the same testimony as that of Carlson and Wright was given by respondents Wilde and Edwards and by Eugene Dent, the salesman who made the contracts with them; also by Harold Koonz, who established that Prestwich confessed it to be the policy of the company to take back animals. Besides the testimony numerous documents published by the company were introduced, showing that the policy and plans of the company were to issue a security contrary to the cited statutes.

### RESPONDENTS JUSTIFIED

The authorities cited by appellant (*People* v. *Davenport,* 13 Cal.2d 681 [91 P.2d 892]; *People* v. *Anderson,* 35 Cal.App.2d 23 [94 P.2d 627]; *People* v. *Steele,* 2 Cal.App.2d 370 [36 P.2d 40]) do not present a state of facts at all akin to the chinchilla epic. It confesses that if the company had sold the animals under agreement to keep them on ranches which it controlled for the purpose of making profits from the sale of offspring to be shared in by respondents and the company "there is no question but that a sale of securities would have taken place."

This is exactly what the court found the evidence to signify. The fact that much testimony was received which might reasonably have warranted findings favorable to appellant is of no avail now. On proof that was unfavorable to appellant the court below chose to determine that the contracts assigned to appellant are securities, and since it is substantial and sufficient the finding will prevail. (*Bellman* v. *San Francisco H. S. Dist.*, 11 Cal.2d 576 [81 P.2d 894].)

In the light of the authorities and of the evidence the trial court could not felicitously or comfortably have derived findings that the statutes were complied with by the company in obtaining the contracts or by the subsequent assignments. Every piece of literature published by the company, every application for purchase and for membership in breeders and all of the arguments presented by the salesmen under the tutelage of the officials of the two interlocked corporations lead to but one conclusion, namely, that the corporations operated a unified scheme; that in ostensibly selling chinchillas they actually sold an organized service; that it was clearly intended that the investors were not to convey the rodents to secluded localities, there to embark upon careers of growing and marketing the animals or their pelts, any more than the purchasers of the Florida acres were expected to engage in producing tung oil upon the ten-acre tracts which they acquired from Mr. Bailey. Respondents were neither furriers nor growers of fur-bearing animals. Their investments having caused the issuance and assignment of nonnegotiable instruments contrary to law, the latter were void and recovery thereon is forbidden by law.

### Parol Proof Was Properly Admitted

■ Appellant next contends that it was prejudicial error to allow parol proof of the representations of the company made at the time of and prior to the execution of the contracts. This contention is based upon the presence in those instruments of the following passages:

"It is agreed that this instrument contains the entire agreement between the parties hereto, and that no warranty, statement, promise, or inducement made by any party hereto, employee or agent of either party hereto, which is not contained in this written contract, shall be binding or valid as to the parties hereto. This agreement shall be binding on the heirs, successors, executors and assigns of the parties hereto. No

change, amendment, alteration or addition in or to this contract shall be binding upon the seller unless such change, amendment, alteration or addition is signed by its duly authorized General Manager.''

It is urged most earnestly that the quoted language is so explicit in fortifying the company and its successors in interest against defenses based upon contemporaneous oral declarations that the writings lose their contractual force if they may be so readily ignored, contrary to such express stipulation to be bound by the writing in any event. In support of its argument it cites the cases of *Pacific States Securities Co.* v. *Steiner*, 192 Cal. 376 [220 P. 304] and *Cobbs* v. *Cobbs*, 53 Cal.App. 2d 780, 784 [128 P.2d 373]. These authorities are not pertinent. They merely declare the general statutory rule (Civ. Code, § 1625) that a written contract supersedes all previous negotiations or stipulations concerning its matter. The Code of Civil Procedure (§ 1856) provides two exceptions to the general rule that ''no evidence of the terms of the agreement other than the contents of the writing'' may be received, namely '' (1) where a mistake or imperfection of the writing is put in issue . . . (2) where the validity of the agreement is the fact in dispute.'' It is commonplace to say that a written contract cannot be modified by a contemporaneous oral agreement in direct conflict with the writing. (Civ. Code, § 1625.) But that does not meet the situation where facts are pleaded showing the illegality of the contract. ▬ When the evidence reveals that the relations of the parties to a transaction are illegal and against public policy the court will deny relief based upon their contract. (*American National Bank* v. *A. G. Sommerville*, 191 Cal. 364, 365 [216 P. 376] ; *Bank of Orland* v. *Harlan*, 188 Cal. 413 [206 P. 75].) Because of the public concern with illegal agreements courts are in duty bound to be on guard lest by virtue of the innocent guise with which such transactions may be camouflaged they should triumph under the eyes of the chancellor. ▬ So pronounced is this rule that a party may not ''by stipulation at the time of the execution thereof or afterward, waive his right to urge the illegality in any action thereon instituted by the other party thereto.'' Thus the parties to such instrument cannot give a quasi validity to such illegal writing by waiver of a defense against a claim of its illegality. (*American National Bank* v. *Sommerville, supra.* ▬ The parol evidence rule does not preclude evidence showing that the consideration for the con-

tract was vicious or illegal. If it could do so the parties to an unlawful agreement might readily defeat the rule by reciting a legal consideration on the face of the instrument. (*Lebal Co. of America* v. *Mastrup,* 51 Cal.App.2d 232 [124 P.2d 348].) The exceptions to the parol evidence rule are as wholesome as the rule itself. Without their application the courts would be handicapped in the performance of their duty to preserve an orderly society in which the public policy as ordained by statute is not to be overridden.

THE CONTRACTS OF SALE ARE NOT NEGOTIABLE INSTRUMENTS

■  Appellant's final assignment is that error was committed in denying the bank recovery upon the contracts in view of the stipulation on the face of the writings that they contained the entire agreement and that no representations other than as set forth were made, the bank having accepted the contracts without knowledge of their infirmities. In other words, it contends that the contracts are negotiable instruments and are subject to no defenses in the hands of an innocent purchaser. In support of this contention appellant cites the conclusive presumptions (1) that facts recited in a written instrument are true as between the parties or their successors in interest; and (2) that a party who has by his own declaration deliberately led another to believe a particular thing to be true, cannot in subsequent litigation be permitted to falsify such declaration. (Code Civ. Proc., § 1962, subds. 2 and 3.) Also, it invokes the rule that if one of two innocent persons must suffer by the act of a third, the sufferer must be he by whose negligence the act occurred. (Civ. Code, § 3543.) But the contracts in question were nonnegotiable instruments. (Civ. Code, § 3086.) Consequently the transferee thereof took them subject to all their vices.

■  The authors of such writings may not impart negotiability thereto under the general law merchant or by statutes. The character of negotiability must appear not by force of the stipulation of the parties that it shall be negotiable "but must be implied by law as the result of the form and effect of the instrument itself." (*American National Bank* v. *Sommerville, supra.*) It is statutory that while a nonnegotiable written contract for the payment of money may be transferred by endorsement conveying thereby all rights of the assignor thereunder, yet it is "subject to all equities and defenses existing in favor of the maker at the time of the indorse-

ment.'' (Civ. Code, § 1459.) ▮ From that section it must follow that there can be no estoppel by contract unless the contract is itself valid. (*American National Bank* v. *Sommerville, supra.*) The contracts being void by virtue of having been executed and assigned contrary to public policy and statute, all attempts to validate and vitalize them by inserting a waiver of such defense are likewise voidable for the same reason. (*Coppell* v. *Hall,* 74 U.S. 542, 558 [19 L.Ed. 244]; *Ornbaun* v. *First National Bank of Cloverdale,* 215 Cal. 72, 77 [8 P.2d 470, 81 A.L.R. 1146]; *C. I. T. Corp.* v. *Panac,* 25 Cal.2d 547 [154 P.2d 710].) The last cited case holds that the title of him who negotiates an instrument is defective within the meaning of section 3136, Civil Code, when he obtains it for an illegal consideration.

In none of the authorities cited by appellant under the contention here under discussion was there an illegal contract. In *Baillarge* v. *Clark,* 145 Cal. 589 [79 P. 268, 104 Am.St.Rep. 75], plaintiff's husband abstracted from her trunk a deed she had executed but had not delivered. After an innocent purchaser from the husband's vendee had with the wife's knowledge made permanent improvements on the property and paid the taxes she was estopped to assert her ownership in an action filed three years subsequently. In *Green* v. *Caribou Oil Mining Co.,* 179 Cal. 787 [178 P. 950], one Lewis while secretary of defendant fraudulently procured the issuance of a certificate of 3,500 shares of its stock which he pledged to Green as collateral for a loan, representing himself to be the owner thereof. The company was estopped to deny Lewis' ownership by reason of the negligence of its officers for a long time prior to the issuance of his stock to examine the certificate books and stock transfers which would have disclosed that numerous other certificates had been similarly issued by Lewis, and because the vice president had signed them without investigating or attempting to ascertain the legality of their issue. In *Butler* v. *Woodburn,* 19 Cal.2d 420 [122 P.2d 17], nothing more was decided than that in accordance with a long line of decisions the vendee of land under an executory contract of purchase ''cannot remain in possession of the land under the contract and successfully resist either the vendor's action for the purchase price or an action to recover possession of the land upon the ground that the vendor's title is defective.'' (P. 423.)

When appellant was approached as a potential assignee of the contracts of respondents, if it purposed to place itself in a secure position against respondents, its duty was to ascertain the meaning of the numerous clauses and conditions of the instruments or to obtain the assurance from respondents that the circumstances of their execution furnished them no valid defense. It would have learned upon inquiry the nature of the obligation to be assumed by the investor in becoming a member of the breeders and that such obligation became a part of each contract. The peculiar phraseology of the covenants of the writings was a sufficient warning that they were not negotiable instruments. But aside from what the contracts could have disclosed to appellant, it was fully aware of the nature of the business conducted by the two corporations, viz., that the company operated throughout the United States in interstate commerce. It knew, of course, that all offspring of the rodents sold should "be registered with a breeders or pedigree association" and that upon the buyer's failure to do so the seller might register them for a charge to become due and payable at once and if unpaid to be added to the balance due under the contract.

For the reasons recited the consolidated judgment is affirmed.

Wood (W. J.), J., and McComb, J., concurred.