[Civ. No. 38700. Second Dist., Div. Three. Nov. 8, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
JOE WITZERMAN et al., Defendants and Appellants.

**COUNSEL**

Ball, Hunt, Hart, Brown & Baerwitz and Frank C. Aldrich for Defendants and Appellants.

Evelle J. Younger, Attorney General, Arthur C. DeGoede and Richard W. Bakke, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COBEY, J.** — Appellants, Joe Witzerman, John Sarver and William S. Eichelberger, appeal from a judgment enjoining them and other persons from, among other things, offering for sale and selling certain cattle care contracts and making or causing to be made certain untrue and misleading statements in connection therewith. The judgment also subjects them and three defaulted defendants,[1] Ranchland Management, Inc., De B. Forslund and Dorothy C. Forslund, jointly and severally, to a civil penalty of $50,000.

The judgment was entered in an action brought by the Attorney General and the Commissioner of Corporations pursuant to Business and Professions Code sections 17535 and 17536 (civil sanctions against false advertising) and former Corporations Code section 26101 (injunction against violation of Corporate Securities Law). Appellants contend that the penalty portion of the judgment should be reversed for the following reasons: (1) they were denied their constitutional right to a trial by jury; (2) the contracts were not securities within the meaning of Corporations Code section 25008; (3) Business and Professions Code sections 17500 and 17536 are unconstitutionally vague; (4) section 17536 is unconstitutional since it imposes penal sanctions without providing the constitutional safeguards requisite for criminal due process; (5) the trial court erroneously interpreted the penalty provisions of section 17536; (6) essential findings of statutory violation are not supported by substantial evidence. We disagree and affirm.

### FACTS

Around November 15, 1965 defendant Forslund suggested to appellant Eichelberger, an advertising salesman for the Sarver and Witzerman Advertising Agency in Long Beach, and to appellants Sarver and Witzerman, the two partners owning and operating the agency, that they become the exclusive worldwide agents for him and his family-owned and controlled corporation, Ranchland Management, Inc. (which did business as Saddle

---

[1]Pursuant to rule 12(a) of the California Rules of Court we have augmented the record on appeal by adding thereto the files of this case (890068) in the superior court. As so augmented the record shows that the default and judgment against Dorothy Forslund have been set aside.

Butte Ranch), to sell cattle care contracts to the public. For some two years Forslund, under such contracts, had been engaged in raising cattle owned by others on his Saddle Butte Ranch at Princeton, Oregon. The advertising agency had prepared for him in 1963, on the basis of material submitted by him, an advertising brochure and was then revising the brochure.

Sarver, Witzerman and Eichelberger were intrigued by the idea and a week or so later took an overnight trip to the ranch to verify some of the things that Forslund had told them about his operation. He showed them deeds, leases, contracts and options to purchase covering about 13,000 acres (a total they verified). He also had them check out a long list of ranch equipment. Neither Sarver, Witzerman nor Eichelberger had any background or training whatever in the business of cattle production and marketing. They tried to familiarize themselves with the business through contacting a professor in the field, the editor of one of the principal trade publications, and reading some governmental pamphlets. They failed, however, to make any real credit check on Forslund or on the financial condition of his operation and they likewise failed to determine whether the ranch actually had the resources in feed to accomplish the cattle care program he was asking them to sell.

This program offered persons of moderate means the opportunity to enjoy the long-term profits and income tax advantages of the cattle raising business by a single investment of $500 or $600 for a cow and a calf to be raised on Saddle Butte Ranch by Forslund.[2] Under the cattle care contracts the proceeds from the annual sale of the calf crop belonging to the purchaser of a contract would be divided between him and Forslund over a six-year period. At the end of the six years the purchaser of such a contract could expect a five-fold increase in the size of his herd without any further investment beyond his original $500 or $600.

On November 29, 1965 the newly formed partnership of Sarver, Witzerman and Eichelberger signed a worldwide exclusive sales agency agreement with Forslund to sell his cattle care contracts for him under the name of Saddle Butte Ranch of Long Beach. The sales agency recruited a sales force and the advertising agency then prepared for subsequent use the necessary sales literature from the material that Forslund submitted to it.

The ensuing campaign of appellants to sell the cattle care contracts in

---

[2]The cattle care contracts were sold for $500 until sometime in May 1966 when the price was increased to $600. The $500 was divided: $225 for the purchase of a unit of a cow and a calf, $125 for the care of the unit, and $150 in sales commissions. The $600 was divided: $250 for the purchase of a cow and a calf, $150 for their care, and $200 in sales commissions. In addition to these commissions the sales agency received two head of cattle for every contract sold.

California lasted for approximately six months. During the campaign Sarver devoted over one-half of his time to the management of the sales agency. Witzerman spent only about 10 percent of his time on the work of the sales agency but did do and direct the work that the advertising agency did for the sales agency in preparing the sales literature used in the campaign. Eichelberger, who had been a salesman all of his adult civilian life, became the full time sales manager for the sales agency and trained (with the help of Forslund) and directed a sales force of some eight to nine persons plus a few franchisees.

Some 152 cattle care contracts were sold in California by the sales agency between December 13, 1965, and June 16, 1966. Total receipts from these sales amounted to $220,705, including perhaps $5,000 for the sale of four franchises; $96,740.62 was spent in the purchase of cows and calves to be raised on the Saddle Butte Ranch under the cattle care contracts. The total sales commissions realized on these sales by the sales agency amounted to $91,500. Of this sum the franchisees and salesmen received $40,340.03.

Within a month or so of the signing of the sales agency agreement, Sarver, Witzerman and Eichelberger discovered that Forslund was substantially in arrears on his ranch bills and the advertising agency began advancing him money to pay these bills, to pay off a mortgage on the land where the ranch house itself was located, and to pay off a note of approximately $20,000 on much of his equipment which had been seized by one of his neighbors on his default on the note. In all, in the next few months the advertising agency loaned Forslund $33,868.09. In addition, in order to keep the ranch going and to expand its facilities sufficiently to accommodate the increase in the number of cattle being raised on the ranch from less than approximately 150 head to at least 600 to 700 head or more, the sales agency advanced him $51,158.97, which was all of the commissions the agency itself received in the course of the sales campaign.[3] Forslund repaid only $100 of these loans and advances.

Meanwhile, on February 16, 1966, the California Corporations Commissioner issued a desist and refrain order directing Sarver and Witzerman, among others, in effect, to stop selling the cattle care contracts in California. This order was promptly served upon both Sarver and Witzerman. Eichelberger apparently promptly learned of its contents. But the three appellants, on the advice of the attorney they then consulted, did not comply with the order. Instead their sales campaign in California continued with an imma-

---

[3] Apparently the sales agency leased the ranch, its facilities and equipment from early February 1966 to early May 1966 partially to secure these loans to Forslund.

terial change in the form of the cattle care contracts offered for sale and some revision of their sales literature. Two further such orders were issued on May 26, 1966 and June 28, 1966 directed against various individuals selling these contracts for appellants. Notwithstanding appellants' knowledge of the contents of these orders, they continued their campaign to sell these contracts in California until June 16, 1966 when Eichelberger bought out the interest of Sarver and Witzerman in the sales agency and continued the sales campaign on his own. Finally, on July 26, 1966, upon the initiation of the suit before us, a temporary order restraining further sale of these contracts was obtained and the campaign within California to sell these cattle care contracts finally came to a close.

## APPELLANTS WERE NOT DENIED THEIR CONSTITUTIONAL RIGHT TO A TRIAL BY JURY

The trial court concluded that "[o]n the facts of this case, no right to a jury trial exists, nor is a jury trial required by the United States Constitution for an action pursuant to Business and Professions Code section 17536." Appellants attack these two conclusions on the basis that since the case was tried solely on the issue of whether civil penalties should be imposed, the case was a criminal prosecution for fines in all but name and that, in any event, the issues tried were legal rather than equitable in nature. Under this analysis appellants' federal and state constitutional rights to a trial by jury both were violated. (See Cal. Const., art. I, § 7; 6th Amend. to the U.S. Const.)

We cannot agree with this analysis. It is true that at the outset of the trial on August 17, 1970 appellants offered to stipulate that a permanent injunction might be entered prohibiting the continuation of their long-suspended campaign to sell cattle care contracts without any admission thereby of past violation of the statutes involved. This offer, though, was not accepted by the People. Furthermore, it did not remove from the subsequent trial the question of appropriate injunctive relief for the People because it did not go far enough. A detailed preliminary injunction in the terms sought by the People had been in effect since September 1, 1966. If appellants wished to remove from the subsequent trial of the case all issues with respect to injunctive relief, their offer should have been to make the existing preliminary injunction permanent. This they did not do; therefore, issues with respect to appropriate equitable relief remained to be tried. (Cf. *Horn* v. *Los Angeles Nut House,* 15 Cal.App.2d 22, 26 [58 P.2d 1299].)

Assuming, without so deciding, that the civil penalties sought represent legal rather than equitable relief, we do not believe that in this case such

issues could have been severed from the equitable ones. The same alleged misconduct on the part of appellants was the basis for both types of relief sought by the People. (Cf. *Jaffe* v. *Albertson Co.*, 243 Cal.App.2d 592, 610 [53 Cal.Rptr. 25].) Under these circumstances trial to the court of the People's case for injunctive relief disposed of as well the People's case for relief by way of civil penalties. (Cf. *Veale* v. *Piercy*, 206 Cal.App.2d 557, 562-563 [24 Cal.Rptr. 91].)[4]

The statutory action before us was not rendered criminal in nature because the People therein sought civil penalties.[5] It is true that a civil penalty is identical in its purpose and monetary effect to a fine. Both are punitive exactions by the government from a person for misconduct imposed to deter such misconduct in the future. But a fine ordinarily carries with it a criminal stigma and much more frequently than not is an alternative punishment to involuntary confinement of the person of the defendant. In other words, in the usual criminal proceeding a defendant faces the peril of the loss of his liberty as well as that of his property. (Cf. *In re Winship*, 397 U.S. 358, 363 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].) In short, the punitive nature of a civil penalty does not make an action to obtain it completely criminal in nature. (See *Madonna* v. *State of California*, 151 Cal.App.2d 836, 840-841 [312 P.2d 257].) This being so, the right to a trial by jury "[i]n all criminal prosecutions" guaranteed by the Sixth Amendment to the United States Constitution does not apply in this case.[6] (See *United States* v. *Regan*, 232 U.S. 37, 47 [58 L.Ed. 494, 498, 34 S.Ct. 213].)

## THE AGREEMENTS WERE SECURITIES

In 1965 and 1966 a security under section 25008 of the Corporate Securities Law (now rewritten as § 25019) included, among other things, "any investment contract." The trial court found and concluded that each

[4]We do not decide whether an action brought *solely* pursuant to Business and Professions Code section 17536 would be legal in nature. The trial court denied appellants' motion at the start of the trial for a trial by jury on the basis that such an action would be equitable in character, but we do not reach this point. (See, however, *People* v. *One 1941 Chevrolet Coupe*, 37 Cal.2d 283, 299-300 [231 P.2d 832]; *Keller* v. *Lewis*, 53 Cal. 113, 118; *County of Sierra* v. *Butler*, 136 Cal. 547, 551 [69 P. 418].)

[5]In this connection we note that the People could have made appellants' conduct the basis for a criminal prosecution. (See Bus. & Prof. Code, §§ 17500, 17534.)

[6]This reasoning disposes of appellants' fourth contention as well. This is that section 17536 is unconstitutional because it imposes civil sanctions without the requisite safeguards of criminal due process. All that is required, even in quasi-criminal proceedings, to satisfy constitutional due process is a trial of fundamental fairness. (See *McKeiver* v. *Pennsylvania*, 403 U.S. 528, 543 [29 L.Ed.2d 647, 659, 91 S.Ct. 1976].)

cattle care contract offered for sale or sold by appellants in California was a security within the meaning of this section.

From December 13, 1965 to July 26, 1966 appellants, as indicated earlier, offered for sale and sold to the public in California cattle care contracts under which defaulted defendant, De B. Forslund, would care for and manage breeding cows and calves at the Saddle Butte Ranch at Princeton, Oregon, belonging to the purchaser of the contracts for a period of six years for specified percentages of the proceeds of the annual sales of the calf crops.

Appellants contend that these agreements were not securities but were instead employment, service or share cropping agreements. They rely on *People* v. *Syde,* 37 Cal.2d 765 [235 P.2d 601]; *Osuna* v. *Russell,* 176 Cal.App.2d 110 [1 Cal.Rptr. 289]; and *Sarmento* v. *Arbax Packing Co.,* 231 Cal.App.2d 421 [41 Cal.Rptr. 869]. Their reliance is misplaced. In *Syde* the child "artists" involved were not merely investors in certain films but were actors in them as well. (*People* v. *Syde, supra,* at pp. 768-769.) *Osuna* involved an agreement for specified royalty payments to those owning certain mining claims by the one undertaking under the agreement to develop and work the claims. (*Osuna* v. *Russell, supra,* at p. 112.) In *Sarmento* 80 acres of growing Tokay grapes were sold to two purchasers for a fixed price. Under the contract of sale the sellers were obligated to care for the grapes at their own expense until the grapes were ready for harvest; the buyers were then obligated to harvest the grapes at their own expense and to stand all risks of loss. A companion contract between the parties required the grapes to be marketed through the sellers. In this transaction, again, the buyers were not merely passive investors in a specified share of the profits and losses of the sellers' business operations. Instead, they made a speculative purchase of a grape crop and shared in both the control and expenses of getting that crop to market. (See *Sarmento* v. *Arbax Packing Co., supra,* at pp. 422-423, 425-426.)

On the other hand, in the case at bench, the purchasers of the cattle care contracts were merely passive investors providing risk capital for the operation of the Saddle Butte Ranch in Oregon. They placed their cows and calves under the exclusive care and control of Forslund and they depended completely upon his skill and expertise in the production and marketing of their cattle for any return on their investment. Under these circumstances the contracts were securities within the meaning of Corporations Code section 25008. (See *Silver Hills Country Club* v. *Sobieski,* 55 Cal.2d 811, 815 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135]; *Hollywood State Bk.* v. *Wilde,* 70 Cal.App.2d 103, 105-107 [160 P.2d 846]; *Continental Marketing Corp.* v. *Securities & Exchange Com'n* (10th

Cir. 1967) 387 F.2d 466, 470-471, cert. den. 391 U.S. 905 [20 L.Ed.2d 419, 88 S.Ct. 1655]; *Securities and Exchange Commission* v. *Payne* (S.D.N.Y. 1940) 35 F.Supp. 873, 878-879.)[7]

## SECTION 17500 AND SECTION 17536 ARE NOT UNCONSTITUTIONALLY VAGUE

■ Appellants attack Business and Professions Code sections 17500 and 17536[8] as being unconstitutionally vague in: (1) the use in the first section of the word "misleading" and the phrase "make or disseminate or cause to be made or disseminated before the public in this State"; (2) in determining under the second section what constitutes a single violation of the first section.[9]

We find nothing unclear in the adjective "misleading." To "mislead" means to guide wrongly. Hence, misleading means deceptive, tending to mislead. (See The Random House Dict. of the English Language

---

[7]The latter three cases involved similar investments by the public in the production and sale of chinchillas, beavers and silver foxes.

[8]Section 17500 reads: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this State, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such personal property or services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

Section 17536 reads: "Any person who violates any provision of this chapter, except Section 17530, shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney in any court of competent jurisdiction. If brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the State Treasurer. If brought by a district attorney, the entire amount of penalty collected shall be paid to the treasurer of the county in which the judgment was entered."

[9]Appellants also challenge the constitutionality of the grant of unlimited discretion to the Attorney General as to which means he will use in seeking enforcement of section 17500—injunction, civil penalty or criminal prosecution. We perceive no constitutional problem in this respect and have been cited to no authority indicating otherwise. Prosecutors normally are granted considerable discretion in how they will prosecute. (See, e.g., Pen. Code, § 17, subd. (b)(4).)

(Unabridged ed. 1966) p. 916; cf. *People* v. *Wahl,* 39 Cal.App.2d Supp. 771, 773 [100 P.2d 550].) Likewise, we find nothing uncertain in the meaning of the challenged phrase. The word "disseminate" means to scatter, spread widely, broadcast or disperse. (See The Random House Dict. of the English Language, *supra,* at p. 415.)

■ What constitutes a single violation of section 17500 for the purpose of imposing a civil penalty under section 17536 depends on the type of violation involved, the number of victims and the repetition of the conduct constituting the violation—in brief, the circumstances of the case. We find nothing unclear in the abstract with the provision. Similar ones appear quite generally throughout our codes with respect to misdemeanors. Whether an interpretation of this provision as made in a particular case is constitutional depends on whether the interpretation is reasonable or arbitrary.

### THE PENALTY PROVISION OF SECTION 17536 WAS CORRECTLY APPLIED

■ The trial court concluded that: "[e]ach separate untrue or misleading statement, each time it is made to a member of the public, is a separate violation of sections 17500 and 17536, if the other requisite elements of section 17500 exist." In imposing a $50,000 overall civil penalty jointly and severally upon appellants and the defaulted defendants, the court, however, neither followed its own definition of a separate or single violation of section 17500 nor exhibited mathematical exactitude. It found that these defendants had disseminated or caused to be disseminated to more than 100 members of the California public three separate untrue and misleading statements. Yet it imposed a $500 penalty for only 100 separate violations by these defendants of section 17500. Thus, the penalty it actually imposed was roughly on a per victim rather than per culpable statement made basis. This would seem to be a reasonable interpretation of this penalty provision. (Cf. *People* v. *Bauer,* 1 Cal.3d 368, 377-378 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398].)

Appellants claim also that the trial court had neither legal nor factual basis for making their liability for the civil penalty of $50,000 joint and several among themselves and the defaulted defendants. Section 17536 provides that: "[a]ny person who violates any provision of this chapter [on false advertising] . . . shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation . . . ." The trial court found, in effect, that each of appellants and the defaulted defendants "cooperated with each other" in the advertising and sale of

the cattle care contracts, that in connection therewith these defendants did disseminate and caused to be disseminated to more than 100 members of the California public three specified untrue and misleading statements and that each of said defendants aided and abetted the specified statutory violations. As we will explain in pertinent part later, these findings are supported by substantial evidence. Consequently it would seem that ample legal and factual bases exist for holding these defendants severally liable for the penalty imposed. Holding them jointly and severally liable instead actually was either an act of clemency or one of discretion to reduce possibly the penalty imposed on each of the individual defendants. In any event, these defendants, being joint and contributing wrongdoers, were properly held liable for the penalty jointly and severally. (Cf. 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 15, p. 1184.)

## The Challenged Findings of Statutory Violations Are Supported By Substantial Evidence

■ On the People's motion for a partial summary judgment prior to trial, the trial court found on March 9, 1967 that defendants admitted or did not deny that they made explicit or implied representations that: (1) defendant, Ranchland Management, Inc. was qualified to do business in California, and (2) the cattle care contracts sold by defendants had been approved by the California Commissioner of Corporations and exempted by him from the California Corporate Securities Law and that both of these representations were untrue. These statements appeared in the first brochure used in the sales campaign. One witness described it as "the primary sales kit."

Appellants do not challenge these findings. Instead, they assert that the trial court's finding after trial that each of them at the time of their making such statements, in the exercise of reasonable care, should have known that the statements were untrue and misleading is unsupported by substantial evidence.[10]

The record is to the contrary. As regards the statement that Ranchland Management, Inc. (a defaulted defendant) was qualified to do business in California, notice of the suspension of the qualification, as of December

---

[10]Appellants also argue that the record does not show that these statements were made or disseminated by them before the public in this state or that the statements were "concerning any circumstance or matter of fact connected with the proposed performance" of the cattle care contracts. These arguments are without merit. The record does show such making and dissemination on appellants' part of these statements and that the statements were made with the intent to induce members of the public within this state to purchase the cattle care contracts.

15, 1965, was sent by the California Franchise Tax Board by mail on December 17, 1965 to the corporation at its Oregon mailing address of record. The qualification was never subsequently revived.

It is true that there is no direct evidence that appellants thereafter learned of this suspension of qualification, but there is circumstantial evidence from which the trial court could have reasonably inferred that in all probability appellants acquired such knowledge during their campaign to sell the cattle care contracts. B. N. Ericksen, a northern California franchisee of appellants, learned of the suspension of qualification the following May from defaulted defendant Forslund, the person actually operating Saddle Butte Ranch. From this fact and the further facts that appellants were in constant contact with Forslund during the roughly six months of their sales campaign and were aware of and dealt with the very acute financial problems of the ranch, the trier of fact could have reasonably inferred that, notwithstanding their testimony that Forslund never informed them during this period of the corporation's loss of qualification, he in fact did so.

In any event, by the exercise of reasonable care, they could have easily discovered the loss of qualification. They did not actually get their first brochures written, printed and sales personnel trained until sometime in January 1966. They had sold only two contracts the prior month. Only one of these was sold before the loss of qualification. Thus, before the start of their organized campaign to sell the contracts they could have, by a single telephone call or letter to the office of the California Secretary of State at Sacramento, easily and quickly learned of the loss of qualification. They could have also inquired directly of Forslund whether the corporation was still qualified to do business in California. They did neither of these things.

■ With regard to the representation that the contracts had been approved by the California Commissioner of Corporations and had been exempted by him from our Corporate Securities Law, the evidence is much more substantial. In October 1965 two of the three appellants were shown copies of the exchange of letters the prior year between Forslund's then counsel and the California Commissioner of Corporations. The letter from the commissioner indicating exemption of the contracts from the California Corporate Securities Law was thereafter incorporated into the primary sales kit of those selling the contracts. A comparison between the 1964 letter of Forslund's then counsel and the cattle care contracts thereafter actually sold by appellants reveals that the plan proposed in 1964, which the commissioner approved, and the contracts used in 1965 and 1966 by appellants differed as oranges do from apples. Under the 1964 proposal

Forslund would care for cattle owned by others on his ranch on a fixed cash fee one-year-basis only and there would have been no sharing of the proceeds of annual sales of the calf crops between Forslund and those owning the cattle over a six-year period. Moreover, the cattle owners would not have been providing risk capital for the operation of Forslund's ranch through the purchase of these contracts but would instead have been paying a flat fee for a service rendered. In exercising the reasonable care required by section 17500, appellants should have made the comparison indicated to determine whether the 1964 exemption applied to what they were selling.

Finally, appellants were certainly put on inquiry as to the continued existence of the assumed exemption when, in February of 1966, the California Commissioner of Corporations issued the first of his three desist and refrain orders. It will be recalled that this order was directed against Sarver and Witzerman, among others, and was personally served on them. No one exercising reasonable care would have completely ignored such an order even on advice of counsel.

■ The third statement found by the trial court to be untrue and misleading that appellants made in their campaign to sell the cattle care contracts was that ". . . [y]earling calves raised on Saddle Butte Ranch will weigh 625 pounds." Prior to trial appellants admitted that they did not know whether any of the calves raised on Saddle Butte Ranch under the cattle care contracts sold by them had actually attained a weight, as a yearling, of 625 pounds. Forslund, however, had told them that he had previously sold yearlings raised on the ranch at weights substantially in excess of 625 pounds and that this was not uncommon. But they failed to verify whether the yearlings they saw on the ranch in November 1965 actually weighed the 700 to 800 pounds that Forslund claimed they weighed.[11]

It appears from the sales literature developed and used by appellants in their campaign to sell the cattle care contracts in California that the cornerstone of the advertised five-fold increase over six years in the size of the herd of a purchaser of a contract was the ability of the calves to reach, as yearlings, a weight of 625 pounds—an acceptable selling weight for yearlings. One of the pieces of sales literature used in the campaign pointed out that this weight could be reached only if the cows and calves were fed an abundance of green feed all summer long. Furthermore, Forslund told appellants that before selling the yearlings, he intended to bring them in from the range to the holding corrals to fatten them on grass.

---

[11]Eichelberger testified that in March or April of 1966 he accompanied Forslund to an auction sale near the ranch where 40 yearlings, raised on the ranch, were sold and that their average weight was far in excess of 625 pounds.

In short, it appears that the advertised selling weight of 625 pounds for yearlings could be reached only when the range forage was supplemented continuously by grain and alfalfa and the cattle were fattened just before sale.

It appears doubtful that such a program of regular continuous supplemental feeding and fattening ever came into existence at Saddle Butte Ranch. It is true that a part of the monies that Forslund received from the sale of the contracts and from the loans made to him by both the advertising agency and the sales agency was devoted to expanding what irrigated pasture there was on the ranch.[12] But much of it seems to have been spent elsewhere in the expansion of other facilities necessary to accommodate the, at least, five-fold increase in the number of cattle cared for on the ranch. Apparently the ranch remained essentially an open range operation where the cattle fed on sagebrush grass and dry-farmed crested wheat. Forslund undoubtedly started to develop sufficient supplemental feed resources on the ranch by expanding very substantially his acreage in alfalfa and other crops but, before he could bring this program to anything approaching full fruition, the money from California stopped and he was then forced to sell off many of the cattle he had on the ranch because he lacked the funds with which to feed them sufficiently to survive the winter. The two or three yearlings he had left on the range in early October 1966 were very poorly nourished and there was no evidence then of any extensive cultivated acreage. Under these circumstances it seems probable that none of the calves raised on the ranch reached, as yearlings, the advertised weight of 625 pounds. Only Forslund knows and he did not testify.

As previously indicated, though, the profitability of the cattle care contracts to the purchasers of them depended on this statement being true and not misleading. None of appellants had any background or expertise whatever in cattle production and marketing. They relied almost entirely on Forslund's representations to them that the ranch possessed sufficient feed resources to support a regular and continuous supplemental feeding and fattening program for the cattle raised there. It would seem in the exercise of reasonable care that before assuring the California public that calves raised on Saddle Butte Ranch would attain a weight of 625 pounds each year, as yearlings, they should have had the ranch's feed resources evaluated by one or more experienced cattlemen. They certainly should have verified in November 1965 the weights of the yearlings Forslund had on the ranch at that time. Furthermore, when they discovered a few months

---

[12]The defense produced several witnesses who testified to the well-nourished appearance of the cattle they saw on the ranch at various times during the first six months of 1966.

later the precarious financial condition of the ranch, they should have made sure that the monies thereafter expended by Forslund, but furnished by them, actually provided sufficient feed resources on the ranch to make this representation of the average weight of yearlings raised on the ranch true and not misleading. They did, however, none of these things.

We hold that the foregoing evidence constitutes substantial evidence that appellants violated Business and Professions Code section 17500 by making, in effect, the statement in one of their contract forms and in certain of their sales literature that ". . . [y]earling calves raised on Saddle Butte Ranch will weigh 625 pounds."[13]

The judgment is affirmed.

Schweitzer, Acting P. J., and Allport, J., concurred.

A petition for a rehearing was denied December 1, 1972, and appellants' petition for a hearing by the Supreme Court was denied January 3, 1973.

---

[13]Appellants also complain that the trial court admitted certain evidence over their objection of alleged false and misleading advertising that was not pled. We have examined the instances offered of this claimed error. We find neither error nor prejudice.