[Civ. No. 48172. Second Dist., Div. Five. Feb. 22, 1977.]

EDWARD TOMEI, Plaintiff and Respondent, v.
FAIRLINE FEEDING CORPORATION, Defendant and Appellant.

**COUNSEL**

Erwin, Anderholt & Scherotter for Defendant and Appellant.

Danielson, St. Clair & Davis and H. Spencer St. Clair for Plaintiff and Respondent.

**OPINION**

**HASTINGS, J.**—John McMordie (McMordie) was an officer and director of Fairline Feeding Corporation, appellant (Fairline). Edward Tomei, respondent (Tomei) was a personal friend of McMordie and had previously invested in the commodity markets through McMordie's office. McMordie asked Tomei if he wanted to invest in the cattle business, and Tomei responded that he didn't know anything about it but that he had $10,000 he could invest. McMordie replied that he and Fairline would take care of everything.

According to Tomei, his next knowledge of the transaction was when McMordie phoned him and advised him that cattle had been purchased for him and that Fairline would bill him and handle all the paperwork. Tomei learned that Fairline would feed and maintain certain cattle for his account. He was required to make a down payment of only a portion of the purchase price, the balance being financed through a local bank using a line of credit established by Fairline. Tomei's account with Fairline was to be charged with the costs of feeding and maintaining the cattle and credited with the proceeds of their sale.

Thereafter, Tomei forwarded to Fairline, as requested, his check for $6,670.37, representing a portion of the purchase price of the cattle. He also executed and forwarded to Fairline a "Security Agreement" which was given to secure to Fairline, by a pledge of the proceeds from the sale of the cattle, any obligations due from Tomei. This agreement was assigned to the local bank as collateral for the loan.

Ninety-nine head of cattle were purchased for Tomei with Fairline paying for the cattle. The cattle were shipped from the seller to Fairline who thereafter maintained the cattle in its yard until sold by it.

The transaction, as a result of the declining beef market and inflating feed costs, was a financial failure. The remaining cost of the cattle, plus costs of feed and medicines, when reduced by the net proceeds from the sale of the cattle, showed Tomei owing Fairline the sum of $17,892.35.

Tomei filed a complaint against Fairline in Los Angeles Superior Court for the return of his $6,670.36, alleging the transaction to be in violation of the Corporate Securities Law in that it constituted an unqualified offering of a corporate security as required by section 25110 et seq., of the California Corporations Code.[1] Fairline cross-complained against Tomei for $17,892.35, being the balance allegedly due on his account with Fairline.

Other facts will be added where appropriate.

Judgment was for Tomei for the amount paid to Fairline. There are no findings of fact or conclusions of law. The court did, however, issue its memorandum of intended decision.

## ISSUES

Fairline states the issues on appeal as follows:

1. Does the cattle feeding arrangement as conducted by Fairline represent a "security" as defined in California Corporations Code section 25110 et seq.

2. If the cattle feeding arrangement, in fact, does constitute a "security" as defined in the California Corporations Code, is it exempt from being qualified under California law.

---

[1]All references are to the California Corporations Code unless otherwise stated. Section 25110 provides: "It is unlawful for any person to offer or sell in this state any security in an issuer transaction (other than in a transaction subject to Section 25120), whether or not by or through underwriters, unless such sale has been qualified under Section 25111, 25112 or 25113 (and no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification) or unless such security or transaction is exempted under Chapter 1 (commencing with Section 25100) of this part."

## DISCUSSION

1. ■ Although the record is devoid of any findings of fact or conclusions of law the court's memorandum of intended decision clearly indicated it considered the "agreement" as a security under California Corporations Code section 25019[2] as defined in *People* v. *Syde,* 37 Cal.2d 765 [235 P.2d 601]; *People* v. *Witzerman,* 29 Cal.App.3d 169 [105 Cal.Rptr. 284]; *Hollywood State Bk.* v. *Wilde,* 70 Cal.App.2d 103 [160 P.2d 846]; Commissioners Policy Letter No. 149C in 1A Marsh & Volk, Practice Under the California Securities Law, App. A-1-109. We agree with the trial court.

*People* v. *Syde, supra,* is the most cited case on the subject. In excluding a personal services contract from the definition of security the court nevertheless stated that the courts ". . . will look through form to substance to discover whether in fact the transaction contemplates the conduct of a business enterprise by others than the purchasers, in the profits or proceeds of which the purchasers are to share." (*Syde,* at p. 768.) *Syde* cites *Hollywood State Bk.* v. *Wilde, supra,* in support of this proposition, and in which it was held at page 107 that contracts for purchase and care of chinchillas were securities since: ". . . it is readily apparent that the investor in chinchillas did not rely alone upon the processes of nature to enrich him. . . . Therefore it was not an investment in the animals only but in a service as well. . . . By making such investments respondents had no thought but that they would profit by the combined and organized efforts of the two corporations . . . ."

The trial court also refers to Commissioner of Corporations Letter 149 C (also cited by 1A Marsh & Volk, *supra,* App. A-1-109). That letter renders an interpretative opinion that a cattle investment arrangement whereby the investors receive expert management of their cattle, including buying, selling, professional· processing, feeding and care, record keeping, financing and insurance is a "security." Reliance is placed by the commissioner on *Syde* and *Hollywood State Bk., supra.* With the exception of insurance, all of the factors discussed by the court in *Hollywood State Bk.* and by the commissioner in his letter are present here.

---

[2]Section 25019, as applicable here, provides in part as follows: " 'Security' means any note; stock; treasury stock; membership in an incorporated or unincorporated association; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription, transferable share, *investment contract* . . . ." (Italics added.)

Fairline relies on two cases which, through application of this general analysis, found that there was *not* a "security" in the facts presented. The first of these cases, *Syde, supra,* involved agreements for personal services whereby private artists contracted to attend the seller's drama school and to share in possible profits of sales of dramatic productions in which they might have performed. The court held: "But since the agreement contemplates actual participation by the artist in the film from which he may realize profit, it cannot be considered as a security within the meaning of the statute . . . ." (*Syde, supra,* at p. 769.) Obviously, there is no analogous participation by respondent Tomei in this transaction.

*Sarmento* v. *Arbax Packing Co.,* 231 Cal.App.2d 421 [41 Cal.Rptr. 869], the second case cited by Fairline, also turned on the active participation of the purchaser. Under the contracts there, the purchasers of 80 acres of grapes were required to bear all risks of loss. This factor was held to preclude the finding of a "security," despite the fact that the seller was to both care for the crops up to the time of harvest and to market them after harvest.

Our case does not involve any such element of participation or control by the purchaser. To the contrary, Tomei did nothing but sign the agreement and send Fairline a portion of the purchase price of the cattle. It is at this point that it is significant to note the extent of Fairline's activity. McMordie, an officer of Fairline, apparently went outside of California, bought the cattle, and had them shipped to Fairline's yard where Fairline's record keeping began. Fairline denies that they had anything to do with the cattle until they reached Fairline's yard, but this seems suspicious since Fairline admits that McMordie is an officer of the corporation. In any event, after the cattle reached the yards, Fairline financed the sale "for" Tomei through a local bank on Fairline's credit lines. The terms of the loan required Fairline to get a security agreement from Tomei, which they did. As seems relevant here, the agreement provided that Fairline shall have the authority to sell the cattle (1) upon default of Tomei of indebtedness due (par. 6) and (2) when continued feed and care is not justified (par. 9). Moreover, paragraph 8 provides that Fairline shall be permitted to apply the proceeds of any sale to expenses, interest, and principal due Fairline from Tomei, before Tomei would get any remaining proceeds.

Clearly, Fairline is the active, controlling participant in this case, while Tomei is a passive purchaser.

Another concept also supports the trial court's decision. Section 25019 lists an *investment contract* under the definition of "security." In *S.E.C.* v. *Howey Co.,* 328 U.S. 293 [90 L.Ed. 1244, 66 S.Ct. 1100, 163 A.L.R. 1043], the Supreme Court held an investment contract "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." (*Howey,* at pp. 298-299 [90 L.Ed. at p. 1249].) *People* v. *Witzerman, supra,* 29 Cal.App.3d 169, adopted this analysis and found it to apply to the cattle care contract there under review. Under that contract, the cattle care company cared for and managed cattle owned by the private investor. The only distinction between that contract and the one in Tomei is that the contract in *Witzerman* provided that a share of the profits from the sale of the cattle was to go to the cattle care company. Such a provision is *not* present here. The trial court noted this distinction but justified its opinion on the basis that Fairline received a fee for its services, which included a mark-up on the food cost, and received interest at the rate of 10 percent per annum on sums owed by Tomei pursuant to the agreement.

Fairline argues that historically the Securities Act provides no relief for an investor unless he establishes actual fraud of some nature.[3]

Protecting the public from fraudulent security transactions was, of course, one of the primary reasons behind the original California corporate securities law of 1917. However, even the original act did not confine itself to just fraudulent transactions.

In 1 Marsh & Volk, Practice Under the California Securities Laws, pages 1-7, we find this statement: "The 1917 Law adopted in California was a combination of the system of licensing securities brokers and agents and a substantive system of securities regulation pursuant to which the decision of the administrative agency as to whether or not an offering was 'fair, just and equitable' was substituted for the judgment of the seller and purchasers of securities even in an arm's length negotiated transaction. Because of the adoption of this substantive standard and administrative attitudes that followed in the course of the ensuing years, California has been characterized as the 'most active and militant State in the regulation of its capital markets.' "

---

[3]He relies on the statement in *People* v. *Syde, supra,* 37 Cal.2d 765, 768, that said: "*In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.*"

The 1968 California Corporate Securities Act retained the basic philosophy of the 1917 law while further expanding it. The language in sections 25110 and 25019 clearly does not limit the regulation of security sales to fraudulent transactions. The determination to be made in each case is whether the facts bring the transaction within the definition of a security as contained in the statute and interpreted by the court.

2. ■ Fairline's second issue assumes, arguendo, that the agreement was a "security" but exempt under the California securities act. Fairline states that the agreement can also be classified as a partnership or joint venture interest and thus exempt under section 25102.[4]

Fairline's argument is invalid for two reasons. *First,* the agreement does not purport to be a partnership or joint venture arrangement. Furthermore it lacks certain legal essentials generally required in such agreements. For example, a joint venture or partnership normally contemplates that the parties share in the profits or losses of the enterprise. Here Fairline was, in one manner or another, assured of profits from the handling of the cattle, while Tomei assumed the risk of loss. *Second,* assuming it could qualify as a joint venture or partnership, this does not automatically exempt the sale of such an interest if it involves a public offering. At the time of this transaction an issuer offer and sale of a partnership interest under section 25102, subdivision (f), was treated as a private (exempt) offering if offers were not made to more than 25 persons and sales not made to more than 10 of such persons.[5]

There was evidence that for 2 years immediately preceding the agreement with Tomei that Fairline had entered into the same form of agreement with approximately 100 other people. Fairline did not, and

---

[4] The pertinent provisions of section 25102 are as follows:

"The following transactions are exempted from the provisions of Section 25110:

". . . (e) Any offer or sale of any evidence of indebtedness, whether secured or unsecured and any guarantee thereof, in a transaction not involving *any public offering.*

"(f) Any offer or sale in a transaction *not involving any public offering,* of any bona fide general partnership, joint venture or limited partnership interest, . . ." (Italics added.)

[5] It was also necessary that the offerors had a preexisting personal or business relationship with the offerees, or that the latter had the capacity to protect their own interests as a result of their business or financial experience.

could not from the evidence produced, demonstrate that the agreement in question was an exempt transaction.

The judgment is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.