Holmes P. McLISH, Plaintiff,

v.

HARRIS FARMS, INC., a California Corporation; Harris Feeding Company, a division of Harris Farms, Inc.; Jack A. Harris; John C. Harris, K. K. Cholakian and Orville E. Bert, Defendants.

No. CV 76–189–EDP.

United States District Court, E. D. California.

April 15, 1980.

Nickolas J. Dibiaso, Thomas, Snell, Jamison, Russell, Williamson & Asperger, Fresno, Cal., for plaintiff.

Ted R. Frame, Frame & Courtney, Coalinga, Cal., for defendants.

## MEMORANDUM OPINION

PRICE, District Judge.

Plaintiff seeks recovery on three causes of action:

A. A violation of the Federal Securities Act, specifically, 15 U.S.C. § 77(e).

B. Violation of the California Corporate Securities Act, specifically, Sections 25000, et seq., of the California Corporation Code.

C. Common law conversion.

Jurisdiction is conferred on the Court by virtue of 15 U.S.C. § 77v, as to the alleged violation of the Federal statutes and the state causes of action by virtue of diversity of citizenship which was properly alleged and conceded by the defendant. Venue is proper inasmuch as the defendant is a resident of the Eastern District of California.

## FACTS

The defendant, in addition to other interests, operated a cattle feed lot near Coalinga, Fresno County, California. Briefly, the defendant fed and processed three categories of cattle at this installation, i. e., cattle wholly owned by the defendant corporation or its majority stockholder, Mr. Jack Harris (hereinafter called "owned cattle"); cattle owned by Harris Farming Company or its principal owners and others (hereinafter called "joint venture cattle"). Consideration of these cattle are pertinent only insofar as they reflect the policies and operations of the defendant's feed lot.

The third category of cattle fed and fattened at the defendant's installation were cattle owned entirely by third persons and in which neither the defendant company nor its principal shareholder, Mr. Harris, had any ownership interest. These cattle are hereinafter referred to as "customer cattle". "Customer cattle" are further subdivided into the following two categories.

1. Cattle in which the purchase price is financed in part by the defendant company, hereinafter referred to as "financed customer cattle".

2. Cattle in which the customer did not obtain any financing from the defendant corporation, hereinafter referred to as "non-financed customer cattle".

The evidence established that the capacity of the Harris Feed Yards increased from a maximum capacity of 50,000 head of cattle in 1970 to a maximum capacity of 100,-000 head of cattle in 1975.

The evidence solicited from the defendant indicated that the company relied on placement of customer cattle in its yard in order to keep the yard at or near the maximum capacity. Keeping the yard full of feeder cattle was admittedly important to the defendant company in order to enable them to operate at maximum efficiency and hence realize the maximum economies of scale. The entire purpose of the defendant in striving for economies of scale was to enable the defendant to maximize the gain of the cattle being fed in relation to the dollars being expended for the care and feeding of the cattle in residence in the yard. The defendant company prided itself in the economies of scale that it was able to realize as a result of its operation and constantly monitored the performance of all categories of cattle that were under its care, custody and control at the feed yard.

To achieve this result, the company constantly reviewed its operation and constantly strived to improve its methods and procedures. These methods and procedures included but were not limited to constantly keeping the cattle under surveillance for illness; moving ill cattle from the feeding pens for treatment in "hospital" pens so as not to spread the contagious diseases among the other cattle in the subject pens; inoculating the cattle upon receipt at the yards to prevent the incidence of disease; feeding cattle specially formulated rations prescribed by Nutritional Services in Bellville, Illinois; prescribing different rations at different periods of the fattening process; keeping specified amounts of feed in front of the cattle at all times in order to encourage constant feeding yet observing the cattle daily to assure that they did not overeat; and, finally, keeping water in front of the cattle at all times in order to encourage maximum consumption of water, again without adverse effect on the cattle.

Most of the customer cattle which were fed at the yard were originally sold to defendant's customers by defendant. As might be imagined, the operation of such a large complex required great amounts of operating capital. This capital was furnished to the defendant by a line of credit furnished to the defendant by the Bank of America (hereinafter called the "Bank"). Evidence before the court indicated that this line of credit sometimes exceeded $20,-000,000.00. In return, the Bank held security agreements on all owned cattle, joint venture cattle, and financed customer cattle, as well as feed stocks, equipment, machines and fixtures.

The defendants were required to furnish the Bank a monthly position report which included a general review of defendant's financial condition, including accounts receivable from customer owned and financed customer cattle.

Because the Bank's lien was a general lien rather than a lien on specific cattle, no termination notice was ever filed when the defendant company sold any of the cattle subject to the general lien.

When the defendant sold financed customer cattle, it in turn took a security agreement from the customer to secure the defendant for the balance of the purchase price of such cattle. This security agreement, in turn, was assigned to the Bank as additional collateral for the Bank's loan to defendant. According to the evidence before the Court, the plaintiff here was required to consent to such assignment.

In November, 1975, the plaintiff found that he had a substantial amount of income for that taxable year which he desired to shelter. After conversation with certain friends and associates, some of whom were or had been customers of Harris, he decided

to inquire into the possibility of feeding some cattle at the Harris feed lot operation. Accordingly, he called Mr. Orville Bert, then general manager of the defendant company feed lot. At the conclusion of the conversation, Mr. Bert agreed to attempt to find a lot of cattle that would meet the plaintiff's tax needs. Bert testified that the perimeters of his search was dictated by the amount of money which Mr. McLish desired to shelter, or, in more understandable terms, a lot of cattle which would consume sufficient feed during the remainder of 1975 and early 1976 which would fit Mr. McLish's tax purposes. It should be noted that this initial inquiry as well as all precontract negotiations were the result of telephonic conversations initiated by Mr. McLish.

In subsequent conversations, Mr. Bert reported to Mr. McLish that he had found such a lot of cattle; that Harris would be willing to finance 75 percent of the cost of the cattle; and that Harris would pre-sell plaintiff such amount of cattle feed that Mr. McLish might want to buy in order to accomplish his tax purposes. Bert also informed Plaintiff that the cattle in question had been purchased by Harris from El Paso, Texas, and that in order to acquire the cattle the plaintiff would not only have to pay for a specified purchase price of the cattle, but would also have to pay the cost of feeding the cattle from the date acquired, i. e., November 2, 1975, and the cost of transporting the cattle from El Paso to Coalinga, California.

Plaintiff did not prove to be an impulsive buyer, and kept the proposal under consideration for several weeks. During this period of time, the rising cattle market did result in a raise in price to the plaintiff of $2.00 per hundred, i. e., from thirty-six cents (36¢) per pound to thirty-eight cents (38¢) per pound. Even after the plaintiff tentatively decided to accept the defendant's offer for the sale of the cattle, defendant kept the offer open for ten days to two weeks while the plaintiff pondered his final decision in the matter. The contractual negotiations terminated after the plaintiff personally came to California and inspected

the cattle in the company of a business associate, one Gary Sprouse, a person with a certain amount of experience in operating a cow/calf operation in Utah and elsewhere. As a result of this meeting, plaintiff announced that he was satisfied with the transaction as proposed, and subject to his inspection of the documents, which had been prepared by defendant in the interim at plaintiff's request, he would consummate the contract. Upon departing from the Coalinga feed yards, he took the prepared documentation with him to his residence in Colorado and eventually returned them fully executed, with the required down payment on the cattle, together with sufficient money to cover the estimated feed that the cattle would consume until January 1, 1976. He determined not to avail himself of any income tax benefit by attempting to prepay for any feed to be consumed by the cattle during the calendar year 1976.

Up to this point, the testimony of the witnesses for both sides was fairly consistent, each with the other. The first conflict in evidence between the witness for the respective parties arises with regard to a telephonic conversation which occurred either in January or February of 1976; no witness ever fixed the date of this conversation with any more specificity. According to Mr. McLish, he advised Mr. Bert, the Harris employee with whom he spoke, that he desired to sell his cattle immediately. Mr. Bert advised, in substance, that he told Mr. McLish that while he could sell any cattle at some price at any time, to sell "warmed up" cattle on the current, falling market would be economically unwise. Plaintiff concurs generally with this portion of the conversation, but stated that he closed the conversation by requesting the Harris organization to obtain offers for the purchase of the cattle and get back to him with regard to these offers. Both sides agree that no such contact was ever made.

Plaintiff testified that he never heard from the Harris organization again until Mr. Salvador, cattle salesman for the Harris organization, contacted him in mid-March and told him that his cattle were "peaked out" and ready for market.

Bert's version of this pivotal conversation was that plaintiff indicated he would "think it over" (presumably on Bert's advice that a sale of the partially fattened cattle would be economically disadvantageous) and let Harris know what his final decision was.

Bert's version of this conversation was the more credible of the two. No credible explanation was ever offered by the plaintiff as to why he would delay for such an extended period of time if he truly desired to effect a sale of his partially fattened cattle.

The next conflict in evidence appears with regard to a series of exchanges between Harris' cattle seller, Mr. Salvador, and the plaintiff. According to plaintiff, the first word he received from the Harris organization after his earlier announced desire to sell the partially fattened cattle occurred on March 16, 1976. As previously stated, Salvador advised plaintiff that his cattle were ready to sell. Salvador requested permission to offer the cattle for sale. Plaintiff gave his permission.

The next day, Salvador called and indicated that he had received an offer of thirty-five cents (35¢) per pound. Plaintiff replied that this price seemed low to him and Salvador agreed, stating that he would try something else. According to plaintiff, Salvador called back later the same day and told plaintiff he had sold six (6) loads for thirty-six cents (36¢) per pound.

Salvador contended that first sale for the first portion of the cattle was specifically approved by the plaintiff at thirty-six cents (36¢) per pound. Salvador's version of this telephonic exchange is borne out by the documentary evidence (see Plaintiff's Exhibit 16, Invoice and Out Ticket No. 6329), and Salvador's testimony concerning company practice regarding obtaining a customer approval before the sale is finally consummated.

Mr. Salvador and the plaintiff are in substantial agreement as to the next telephonic exchange. This occurred on March 23, 1976. Again Salvador called offering plaintiff a price of thirty-five cents (35¢) per pound. Again plaintiff demurred. Again,

Salvador agreed to try to obtain a better price. Either explicitly or implicitly, the two conversants agreed that a price of thirty-six cents (36¢) a pound which had previously proven acceptable to plaintiff would be acceptable. Plaintiff testified that Salvador called the plaintiff later the same day and informed plaintiff that he had sold the balance of the plaintiff's cattle to O'Neill Packing Company for thirty-six cents (36¢) per pound. Plaintiff contended at trial that he never authorized the second sale at thirty-six cents (36¢) per pound, although his deposition testimony seems contrary.

Salvador, in summary, testified as follows:

First sale of six loads: The first bid he received was for thirty-six cents (36¢), which was communicated to plaintiff on March 17th, and the sale at that price was specifically approved by plaintiff.

Second sale: The first bid on the balance was for thirty-five cents (35¢). This was communicated to plaintiff, who rejected the bid, but instructed Mr. Salvador to sell at thirty-six cents (36¢) if he could obtain that price. The second sale was consummated on the basis of that authorization.

Plaintiff's copies of the "Invoice and Out Tickets" began to arrive from the Harris office. These tickets showed that not only was the gross weight of the cattle being sold by plaintiff reduced by 4% due to "shrink", but that the cattle continued to be boarded at the defendant's yard at plaintiff's expense for various periods after the sale was consummated. The defendants' witnesses testified that this was in accordance with the accepted and universal trade custom and usage, which testimony was not contradicted by witnesses offered by the plaintiff. The court therefore is required to accept both the deduction for "shrink" and the continued maintenance of the cattle as being incorporated into the sales contract by such trade custom and usage.

Nevertheless, the plaintiff facing substantial loss on his venture, orally instructed the defendant to re-offer the cattle in the market and to inform him of the prices

that they were able to obtain as a result of such activity. The defendant, in turn, informed the buyers that they were unable to ship the remaining cattle on hand pursuant to plaintiff's orders. After being threatened with suit, defendant chose to honor the contract that had been made with the independent buyers of the plaintiff's cattle. This act on the part of defendant forms the basis of plaintiff's contention that the defendant converted his cattle.

It is extremely difficult to tell when the plaintiff first informed Mr. Salvador by telephone not to deliver the cattle. Apparently no one kept any notes regarding the conversation, and the plaintiff did not offer any statements from the telephone company to substantiate the date upon which such telephonic instructions occurred. However, there is in evidence a photocopy of the wire received by Harris from the plaintiff containing such instructions dated April 5, 1976 (see Defendant's Exhibit G). At this time there remained on hand at Harris' Feed Lot 257 cattle that had not been delivered to the buyer. (The Court notes that four (4) steers were delivered to Hanford Meat on April 4, 1976, but there is no evidence as to whether they were shipped before or after receipt of plaintiff's wire by Harris.)

Because of plaintiff's failure of proof on this point, the court finds that 257 cattle constitute the number of head that the Court will consider with regard to the conversion count.

Although the defendant issued a brochure which contained the following invitation:

"The opportunity for investors to participate in the exciting business of feeding cattle can be arranged through:

1. Harris Feeding Co.
2. Your own bank.
3. Qualified investment programs."
(See Plaintiff's Exhibit 9).

both sides concede that defendant never filed a registration statement covering this proffered "investment" under 15 U.S.C. § 77(e), or qualified it pursuant to California Corporation Code Sections 25111, 25112 or 25113.

We now turn to whether such actions on the part of the defendant were necessary in order that he escape liability.

## THE LAW

### A.

#### Federal Law

■ There is adequate evidence of the utilization of the instrumentalities of interstate commerce in communication to bring this case within the ambit of Section 77(e) of the Securities Act of 1933.

In *S. E. C. v. Joiner*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), Justice Jackson wrestled with a hybrid commercial transaction wherein the defendants actively solicited investments in percentage interests in oil leases which the defendants had acquired by promising to drill a well on the leased property. This appeared to be the only consideration given to the land owner for the lease. The Supreme Court reversed the lower courts, stating, "We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents. Instruments may be included with any of these definitions, as a matter of law, if on their face they answer to the name or description. However, the reach of the act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as a matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character or commerce as 'investment contracts' or as 'any interest or instrument commonly used as a "security".' "

It would appear that Justice Jackson was suggesting a non-mechanized case by case approach to determine whether or not such a hybrid type transaction, such as that before the court, constituted a "security" within the meaning of the Act.

If that was, in fact, Justice Jackson's intent, it did not long survive. During the 1945 Term, the Supreme Court decided the case of *S. E. C. v. Howey*, 328 U.S. 293, 66

S.Ct. 1100, 90 L.Ed. 1244. In this case, Justice Murphy was assigned to write the majority opinion. It was in this case that Justice Murphy mechanized the test for determination of whether an "investment contract" amounted to a security, as follows:

"In other words, an investment contract for purposes of the Securities Act means a contract transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits *solely* from the efforts of the promoter or third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. Such a definition necessarily underlies this Court's decision in *Securities and Exchange Commission v. C. M. Joiner Leasing Co.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, and has been enunciated and applied many times by lower federal courts." (emphasis added)

As a matter of historical interest, Justice Jackson did not participate in the consideration or decision in *Howey.*

*Howey* stimulated a substantial trend toward the mechanical application of the test enunciated therein, and soon gained a large following in both the Federal and State courts. Many learned scholars became critical of the mechanical application of the *Howey* test, arguing that Justice Murphy himself stated in the context of the opinion that the Congress desired the definition of a security to be a flexible rather than a static one "capable of adaptation to meet the countless and variable schemes devised by those who seek to use the money of others on the promise of profits." Others criticized the requirement that the investors expectation arise "solely" from the efforts of others.

It was to this latter issue that the Ninth Circuit addressed itself in *S. E. C. v. Turner*, 474 F.2d 476 (9th Cir. 1973), cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53. The court had before it a pyramiding operation which did require some effort on the part of the investor. As is characteristic with most pyramiding, the ultimate logical result of such scheme is a total collapse of the entire scheme, benefiting only those at the very top of the pyramid.

In determining whether or not this series of offerings by the defendant constituted a security, the court was faced squarely with the issue: "Did the word 'solely' as used in the *Howey* test mean precisely what it said?"

After admitting that the returns or profits of an investor in one or more of the Turner offerings were not coming "solely" from the efforts of others, the Court stated in pertinent part:

"We hold, however, that in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of a security should be a flexible one, the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities. \* \* \*

"Strict interpretation of the requirement that profits to be earned must come solely from the efforts of others has been subject to criticism. See, e. g., *State of Hawaii v. Hawaii Market Center*, Haw. 1975, 485 P.2d 105. Adherence to such an interpretation could result in a mechanical, unduly restrictive view of what is and what is not an investment contract. (citing cases) It would be easy to evade by adding a requirement that the buyer contribute a modicum of effort. Thus, the fact that the investors here were required to exert some efforts if a return were to be achieved would not automatically preclude a finding that the Plan or Adventure is an investment contract. To do so would not serve the purpose of the legislation. Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."

Although the principles enunciated in *Howey* and *Turner, supra,* are sufficient to dispose of the instant case, we are fortunate to have a Ninth Circuit case involving a factual situation substantially similar, if not identical, to the instant case before the Court.

*Hector v. Wiens,* 533 F.2d 429 (9th Cir. 1976), presented the following facts. Plaintiff was a North Dakota grain farmer. The defendants were a Montana feed lot operator. The parties entered into a business arrangement whereby the defendant feed lot operator was to buy, feed, and sell cattle and hogs for the farmer's account. The bank financed all livestock purchases and took notes from the farmer secured by the cattle and hogs. Bank loans were to be repaid from the proceeds of the sale of the fattened animals. The plaintiff farmer agreed to provide grain from his farm to the feed lot for use in feeding the animals, and the bank was to advance to the farmer an amount equal to his costs in producing and shipping the grain, taking notes from the farmer secured by the grain. These notes, too, were to be paid from the sale of the fattened livestock. The value of the grain delivered by the individual farmer was then deducted from the feed lot's ordinary charges for feeding and tending the animals. These arrangements were in operation for some time before the bank discovered the animals and feed on the feed lot were not sufficient to secure the bank as to balances due on the loans outstanding to plaintiff. Plaintiff sued the defendant, alleging multiple causes of action, one of which alleged a violation of the Securities Act of 1933, and the Securities Exchange Act of 1934. This latter allegation was contained in plaintiff's sixth cause of action. The bank filed a motion to dismiss the sixth cause of action as to it. The District Court treated the motion as a motion for summary judgment and granted the same.

The Ninth Circuit, in a per curiam decision, reversed and remanded the case for further proceedings consistent with its opinion. Although the decision is based on a motion for Summary Judgment, the opinion affords us an excellent guide as to the rules to be used in measuring this particular form of commercial transaction against the applicable Federal statutes. This we proceed to do.

The first requirement of *Howey* is that the investor must make an investment of money. In *Hector,* the defendant argued, and the District Court agreed, that since Hector had not invested his own money, but had merely invested his credit, the first portion of the *Howey* test was not met.

In the instant case, the evidence is undisputed that McLish invested both his own money and his credit. As a condition of the transaction, defendant required McLish to deposit twenty percent (20%) of the total cost of the cattle as a down payment, and further required him to prepay for the estimated amount of feed to be consumed by the cattle during the balance of the year 1975. Mr. Bert, the defendant's feed lot manager, testified that with this much money up front, the defendants felt comfortable with the transaction.

In *Hector,* the court swept aside contention of the defendant bank, and stated that the investment of credit, since it subjected the plaintiff to risk of loss, clearly met the *Howey* test. Since McLish not only invested credit, but also invested a substantial sum of money, clearly, the first leg of the *Howey-Hector* test is met.

The second requirement of the *Howey* test is a common enterprise. In *Hector,* the Court stated that in the Ninth Circuit, a common enterprise is defined as follows:

" * * * one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking investment or of third parties. *S. E. C. v. Turner, supra,* at p. 482, n.7. The commonality required is vertical (between the investor and the promoter) rather than horizontal (among multiple investors)."

After a discussion, the *Hector* court decided there was a material issue of fact to be determined at the trial as to whether the bank was a participant in the common enterprise between the parties.

However, the facts in this case are without dispute on this point. In the instant case, it was the defendant who offered the cattle for sale; trucked them from their then location in El Paso, Texas, to the California feed lot; prepared the necessary documents and provided the necessary capital for plaintiff to consummate the transaction. Plaintiff's reasonable expectations were that he would gain a significant income tax advantage from the transaction and, hopefully, at the end would make additional profit. Defendants were to be benefitted by the occupation of their feed lot at or near capacity, by the profit to be realized from the goods and services furnished under the feeding contract, as well as the additional interest charged to the plaintiff over and above the amount being paid by defendant to the bank. Hence, the existence of a common enterprise between plaintiff and defendant is established by clear and compelling evidence.

The third requirement of the *Howey* test, as modified in *S. E. C. v. Turner,* might be stated as follows: The investor has an expectation of profits from the efforts of the promoter or third party, which efforts are the undeniably significant ones, and include those essential managerial efforts which affect the failure or success of the enterprise.

In *Hector v. Wiens,* the court found on the basis of the record, that again there was a substantial and material disputed issue of fact.

*Hector* presented significant facts that are not present in the case now before the court:

1. The role of the plaintiff Hector in supplying grain to the feed lot,

2. The frequent visitations of the plaintiff to the feed lot, and

3. The assistance of the plaintiff in purchasing some hogs for the feed lot.

No such participation by Mr. McLish occurred after he consummated his purchase of the cattle from the defendant. Indeed, he was only at the feed lot approximately one hour prior to consummating the purchase of the cattle; he never supplied any feed or even advice concerning feed with regard to the feeding of the cattle, nor did he participate in any way in acquiring animals to be fed at the feed lot. Indeed, the totality of the defendant's control over the plaintiff's cattle and the significance of his activity with regard to the production of the hoped-for profits of the plaintiff is best told by the collected portions of the stipulated set of facts which were signed and filed by the parties in the instant action, and which are attached hereto as Appendix A.

Defendant argues strenuously that under the arrangement between the parties that the plaintiff had certain significant rights which would prevent this transaction from meeting the third requirement of the *Howey-Turner* formula. Significantly he argues the plaintiff had the following rights which prevent this transaction from becoming a security:

1. Right to sell the cattle before they were fat.

2. Right to move the cattle to another feed yard if dissatisfied with the care and feeding.

3. Right to sell the cattle when fat.

4. Harris had no right to sell the cattle without the plaintiff's consent.

Plaintiff's Exhibit 1 is a pre-printed document furnished to the plaintiff by the defendant on his visit to Coalinga in early December, 1975. It is entitled, "Cattle Purchase, Feeding and Security Agreement". It is dated November 21, 1975, which admittedly is post-dated backward from the date it was signed, to conform to the oral arrangements entered into by the parties.

The agreement is fully executed by the plaintiff and by an authorized corporate officer of the defendant.

A synopsis of that agreement follows.

Under paragraph three, plaintiff agreed to pay Harris a deposit on account of the purchase of the cattle. The paragraph further provides that should Harris in his sole discretion deem this deposit inadequate, and that Harris' position is insecure, Harris may

demand such additional deposit from the plaintiff as Harris deems reasonable. The paragraph further provides that the plaintiff agrees to pay to Harris such additional deposit on demand.

In paragraph five of the agreement, the parties agree to create a security interest in and to plaintiff's cattle and any proceeds therefrom pursuant to the Commercial Code of the State of California. By Plaintiff's Exhibit 3, the Security Agreement was assigned to the Bank of America, Agricenter Branch No. 87. The Court finds that this security interest was perfected under California Law.

Paragraph six provides that the purchase of the cattle is completed when, in Harris' sole discretion, they are finished and ready for slaughter. Plaintiff agreed to accept delivery of the cattle on that date, and to pay all charges owing to Harris as reflected in plaintiff's account. According to the paragraph, Harris' determination that the cattle were finished and ready for slaughter was final and was not subject to disputation by plaintiff.

Paragraph eight provides that payment of all cattle sold by Harris on account of the plaintiff would be paid directly to Harris. The paragraph further provides that should McLish direct that the cattle be shipped to a packer not of Harris' choosing for slaughter, that the plaintiff shall assign the proceeds of such sale to Harris, or if the plaintiff should direct that the cattle be removed and shipped to a third person for purposes other than slaughter, that the plaintiff must pay Harris in full before such delivery is made to plaintiff or to his designated recipient. Finally, the paragraph provides that the proceeds of such sale or removal by whomsoever made, shall be applied first to the plaintiff's account with Harris, and that Harris will then render to the plaintiff a full statement, as contemplated by paragraph seven of the agreement.

Finally, paragraph nine provides that should the purchaser default in the payment of any sums owing to Harris under this agreement, and fail to remedy such default on demand, Harris then may, at his option, be relieved of all further obligations and dispose of said cattle as Harris sees fit, and retain all sums theretofore paid on account of such sale as liquidated damages. The paragraph further provides that alternatively Harris may proceed to sell the entire remainder of the lot of the cattle, and after crediting the proceeds of said sale to the cost of the sale, apply the balance to the plaintiff's account, and to collect the deficiency, if any, from the plaintiff. The paragraph contains an affirmative covenant on the part of the plaintiff to pay any assessed deficiency.

Measured against the panoply of powers granted to the defendant in this contract, the rights which the plaintiff had to control the transaction pale by comparison. The whole scheme of the contract as developed by the defendant, is to secure absolutely repayment to the defendant of all the charges regardless of what fate befell the plaintiff due to the variations to the cattle feeding market. In addition to the day to day, and indeed hour by hour management of the cattle as set forth in Exhibit A, the contract gave the defendant absolute control over the removal of the cattle from the care, custody and control of the defendant by, (1) creating a lien in the cattle, thus encumbering the title to the animals, and (2) not being willing to further finance the plaintiff in the event the plaintiff desired to remove the cattle from the care, custody and control of the defendant. So it would appear that the plaintiff's right to sell the cattle before they were finished greatly diminishes in significance to the fact that to exercise this right, the plaintiff must come forward with a substantial sum of money to satisfy his account with Harris, i. e., enough to free the cattle from the lien of the security agreement.

Similarly, the right of the plaintiff to approve any sale of the cattle after they became fat is offset in its practical application by paragraph three of the Cattle Purchase, Feeding and Security Agreement, which gives Harris the right to demand additional security should Harris deem itself insecure. Indeed, there was testimony

on the part of Harris personnel that one of the examples of a situation where Harris might deem itself insecure would be a situation where the cattle were finished, fat and ready for slaughter, and yet the owner of the cattle might persist in his refusal to sell the cattle at the then prevailing market price.

Defendant makes much of the fact that Harris has never had occasion to call for additional deposits from any of its feed lot customers. Frankly, the Court attaches little significance to this bit of history. With the experience that Harris had amassed in the feed lot business, it is undoubtedly no coincidence that Harris' requirement of twenty percent (20%) down was calculated to prevent the imposition of a "call" on any of its customers. In conclusion, the Court has no difficulty in finding that the efforts of Harris were "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise".

## B.

### State Law

Although the California courts, even before the announcement of the *Howey* decision, had adopted the "expectation of profits" test in determining whether a transaction constituted a security, they did so with reference to state blue sky statutes rather than to federal law.

Regardless of the genesis of the "expectation of profits" test, plaintiff's claim for damage based on defendant's failure to qualify his feeding program under the California Corporate Securities Act could be disposed of upon the same rationale as the Court has applied to the Federal laws but for *Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811, 13 Cal.Rptr. 186, 813 P.2d 906 (1961).

In *Silver Hills* the promoters were selling memberships in a country club yet to be built and developed. About all the promoters had to offer the prospective member in the way of solid assets was the contract for the sale of real property upon which the club was to be built and a $400.00 down payment which had been made on account of the contract. In addition to the acquisition of the land, improvements contemplated to be made in the future also were to be made in part from the sale of memberships. The defendant Commissioner of Corporations of the State of California concluded that the membership in the proposed club constituted a "beneficial interest in the title to property" and therefore was a security as then defined by the applicable sections of the California Corporations Code. The Commissioner issued a cease and desist order directing the petitioners to stop the sale of memberships; the petitioners in turn sought a writ of mandate to compel the Commissioner to vacate the order.

Obviously the purchasers of memberships did not fit the mold of the ordinary investor who was investing his assets in either tangible or intangible assets, expecting a financial profit from such investment. Hence, using neither the "expectation of profits" test, which up to that case had been fashioned by the California courts, or, in the alternative, the three-way test fashioned by the United States Supreme Court in *Howey*, this transaction would not qualify as a security. To effectuate the purposes of the act the California Supreme Court fashioned a new test which the commentators have labeled as the "risk of loss" test. In essence, Chief Justice Traynor, speaking for the California court, refused to grant the writ of mandate annulling the cease and desist order, stating that the only way that the purchaser of a membership might realize any benefits from the club was to risk his capital along with the other purchasers. Having found that the purchasers were in fact experiencing a "risk" attendant on the purchases, Chief Justice Traynor continued in the same vein as follows:

"Since the act does not make profit to the supplier of capital the test of what is a security, it seems all the more clear that its objective is to afford those who risk their capital at least a fair chance of realizing their objectives in legitimate ventures whether or not they expect a

return on their capital in one form or another.

" * * * the act extends to transactions where the capital is placed without expectation of any material benefits. Thus, from its exemption of securities of certain nonprofit companies, the act exempts 'notes, bonds, debentures or other evidence of indebtedness, whether interest-bearing or not'."

One can read hundreds, indeed, literally thousands of pages of commentary since the announcement of the *Silver Hills* case by the California Supreme Court, as well as study intently the decisions of the California Appellate Courts since *Silver Hills*, and still not be able to state with any degree of certainty as to whether or not it was the purpose of the California Supreme Court in *Silver Hills* to supplant the "expectations of profit" test with the "risk of loss test", or merely to supplement the "expectations of profit" test with another test where, in the Court's view, the purposes of the securities act would not be served because of the transactional bias contained in the "expectations of profits" test.

Again we turn to a fact situation recently before the California intermediate Appellate Court similar to the fact situation presented to this court for decision.

*Tomei v. Fairline Feeding Corp.*, 67 Cal. App.3d 394, 137 Cal.Rptr. 656 (1977) presented the following set of facts.

One McMordie, a personal friend of the plaintiff, was an officer of the defendant company and presumably was also a commodity broker. The plaintiff had previously invested in commodities through McMordie's office. McMordie approached plaintiff and inquired as to whether or not he wanted to invest in the cattle business. Plaintiff made the inevitable mistake of admitting that he had $10,000.00 to invest, but he didn't know anything about the cattle business. McMordie assured the plaintiff that Fairline would take care of everything.

The next thing that plaintiff knew, McMordie had called him and informed him that the cattle had been purchased for his account, Fairline would bill him and take care of all of the paper work, and that Fairline would feed and maintain the cattle for his account. McMordie further informed him that he was only required to pay a portion of the purchase price as a down payment, that the balance was being financed through a local bank through a line of credit established by Fairline. Also similar to the factual situation of the case before the court, plaintiff's account was to be charged with the costs of feeding, caring for and maintaining the cattle, and credited with the proceeds of their sale.

Like the case before the court, the plaintiff deposited the down payment representing only a fraction of the purchase price of the cattle, executed a security agreement to secure Fairline with regard to the balance of the purchase price as well as the feeding and maintenance costs, which security agreement in turn was assigned to the bank as collateral for the money furnished to purchase the cattle.

Also, as in the instant case, the decline in the beef market resulted in plaintiff sustaining a substantial loss.

Plaintiff Tomei sued Fairline to recover his down payment of $6,670.36, the total amount he had paid to Fairline up to the time that Fairline sold the cattle for his account. Fairline, in turn cross complained for $17,892.35, being the balance allegedly due on plaintiff's account with Fairline.

The issues on appeal were defined as follows: (1) Does the cattle feeding arrangement as conducted by Fairline represent a "security" as defined in California Corporations Code, Section 25110, et seq., and (2) if the cattle feeding operation, in fact, does constitute a "security" as defined in the California Corporations Code, is it exempt from being qualified under California law?

In affirming the trial court's judgment for the plaintiff, the court pointed out that Fairline was the active controlling participant in the transaction while Tomei was merely a passive purchaser. Indeed, the opinion characterizes Tomei's conduct as being nothing more than signing the agree-

ment and making the down payment. Factors relied upon by the court to reach this decision are as follows:

Fairline would have the authority to sell the cattle upon (1) the default of Tomei of any indebtedness and when continued care and feeding is not justified; (2) Fairline would be permitted to apply the proceeds of any sale first to the indebtedness owed to Fairline by Tomei of whatever nature, and the balance of the proceeds, if any, would be returned to Tomei.

Although it would appear from the court's discussion the critical paragraph in the Tomei-Fairline agreement may have been arranged in a different juxtaposition, the end result is precisely the same. Fairline had absolute control of the situation, and the only way that Tomei could assert even a modicum of control over the cattle was to completely eliminate any balance due to Fairline.

As another basis for its decision, the Appellate Court pointed to the common enterprise test enunciated under *Howey*, and citing as further authority the case of *People v. Witzerman*, 29 Cal.App.3rd 169, 105 Cal. Rptr. 284 (1972).

In the instant case, as indicated by evidence that was uncontradicted, Harris added a markup to its actual costs of foodstuffs and other materials supplied for the care and keeping of the McLish cattle. In addition, the security agreement specifically provides that the interest rate to be paid by the plaintiff McLish to the defendant Harris Feeding Company is to be one percent (1%) over the rate paid by Harris Feeding Company to the bank.

■ Significantly the *Tomei* court nowhere cites the *Silver Hills* decision or makes reference to it. Although defendant did not petition the Supreme Court for a hearing, it is significant that the Supreme Court did not order the matter transferred to its jurisdiction on its own motion as it is empowered to do under Rule 28(a), California Rules of Court. Hence, the Court finds that the transaction in question was a security as defined in California Corporations Code. Having failed to so qualify this transaction, defendant is liable to the plaintiff under the California statutes as hereinafter determined.

## C.

### Conversion Issue

■ From the Court's analysis of the evidence and a review of the applicable law, the Court is satisfied that the defendant did not convert the plaintiff's cattle, or any of them. By virtue of Plaintiff's Exhibit 1, the plaintiff designated Harris as the plaintiff's agent for the sale of his cattle. Viewing the evidence most favorable to the plaintiff, the plaintiff, if not explicitly, implicitly gave defendant authority to sell the remaining cattle on hand after the first sale of six (6) loads at thirty-six cents (36 ¢) per pound. Actually, Harris, in the discharge of his duties as the plaintiff's agent, sold some of the cattle at even a higher price.

The case of *Holloway v. Thiele*, 116 Cal. App.2d 68, 253 P.2d 131 (1953) cited by the plaintiff, is inappropriate. In that case, the real estate broker who was holding the deposit, became a mere stake-holder after the dispute arose between the buyer and seller as to who was entitled to the deposit. Being a mere stake-holder, it was the broker's duty to interplead the balance of the fund after deducting the portion to which he was entitled by the agreement, if any.

As pointed out above, defendant was much more than a "stake-holder" of plaintiffs' cattle; he might well qualify as an "agent coupled with an interest". (See 1 Witkin—Summary of California Law) (8th Ed.), 816 et seq., particularly 817 and 818.

## CONCLUSION

### Amount of Judgment to be Entered Against Defendant

Having decided the matter of liability in favor of the Plaintiff, the Court now turns to the matter of the amount of judgment to be entered. The formula for the entry of judgment under the Securities Act of 1933 and the California Corporations Code are practically identical. The one significant

difference between the Acts is the plaintiff's entitlement to interest. The federal statutes are silent on the point, and the federal cases are divided as to whether or not the Courts should allow interest, and under what circumstances. However, the California cases do allow interest, and since the plaintiff is only entitled to one recovery (although the defendant is found to be liable under both Acts) the Court will follow the California law in allowing interest at seven percent (7%) from the date of April 19, 1976.

Accordingly, the Court finds that the plaintiff is entitled to judgment against the defendants Harris Farms, Inc. and Harris Feeding Company, a division of Harris Farms, Inc., in the amount of $94,449.32, together with interest thereon at the rate of seven percent (7%) per annum from April 19, 1976. Parenthetically, I might say that the date of April 19, 1976 is the date that the account was finally settled between the parties, and the defendant disbursed the remaining proceeds of the sale of the cattle to the plaintiff.

Plaintiff also seeks attorney's fees and costs pursuant to Section 77(k) of 15 U.S.C. ▮▮▮▮ Unlike other actions, costs including attorneys fees are not allowable as a matter of course to the prevailing parties in Securities cases. In order to recover such additional emoluments, the prevailing party in securities cases must prove that either the suit itself or the defense thereto was without merit, bordering on triviality, and the Court must so find in awarding attorneys fees and costs. (See *Can-Am Petroleum v. Beck*, 331 F.2d 371 (10th Cir. 1964) at 374.) In good conscience, the Court cannot so find in this case, as the Court announced during the trial, it felt this case to be a close one, and only after all of the evidence was in and the case carefully considered in view of the applicable law, was it able to finally determine that the plaintiff should prevail.

Plaintiff's counsel will prepare findings of fact and conclusions of law, and the judgment pursuant to the ideas expressed in this Memorandum.

## APPENDIX A

*Portion of Stipulation of Facts by Parties*

9. The cattle are fed by HFC. Cattle in a feedyard are fed different "rations" (a diet composed of numerous feed ingredients) at different times for different purposes. HFC has three separate rations, ranging from low energy to high energy rations. Each of the rations are a balanced diet for the cattle formulated by a nutritionist. Each component in the ration contributes to a different nutritional need of the cattle. HFC's "ration no. 1" is a high energy ration, compounded and formulated to put the maximum weight gain on the cattle at minimum cost in the minimum amount of time. HFC's "ration no. 3" is a low energy starter ration. When the cattle arrive at the feedlot, they are first fed a low-energy ration. Cattle are initially fed a low-energy ration because an immediate diet of a high energy ration will "scour" the cattle, i. e., give the cattle diarrhea. In addition, it is important to start the cattle on a low energy ration in order to acclimate their digestive system to feedyard eating (as opposed to pasture or range grazing), and because they will refuse to eat a high energy ration at the outset of their feedyard stay. If the cattle do not eat, they will not gain weight and the cost of gain is adversely effected. Also, if the wrong ration is fed at the wrong time, the cattle will not gain weight properly. Thus, it is necessary to start the cattle off with a low energy ration and gradually increase the energy of the ration up to the high energy ration; once at the high energy ration, the cattle are maintained on the high energy ration until they are fat and finished, and thus ready for slaughter.

10. The "rations" which are fed to the cattle consist of various kinds of feed components. The rations are composed of different components in order to achieve a balanced ration that gives the cattle the proper amount of fiber, protein, and energy at each feeding, consistent with the nutritional needs of the cattle at their particular

stage of growth. The components of the feed are changed from time to time according to the availability of the ingredients and the cost of the ingredients. HFC attempts to feed its cattle in a manner designed to achieve the maximum weight gain at the cheapest feed costs, in order to minimize the "cost of gain". Accordingly, HFC reevaluates its rations at least every two months, and will change the rations to reduce the cost of the feed if cheaper components become available. The preparation and formulation of HFC's rations is done by Nutritional Services in Bellville, Illinois. Nutritional Services uses a computer in formulating HFC's rations. Experience and training are required to formulate a ration.

11. The decisions as to when to change the type of ration fed to the cattle were made by Dave Wood, the feedlot manager of HFC. The determination as to when to change the cattle's ration is based on the cattle's weight, the time in the pen, and the type of cattle. In addition, Mr. Wood examined the cattle, the condition of their hair, and the condition of their manure in making a determination as to whether the cattle should be moved to a higher energy ration. The decision is important, because if the cattle are switched to a higher energy ration at the wrong time, they will refuse to eat, their weight gain process will be slowed down, and thus the "cost of gain" will be higher.

12. Feed is kept in front of the cattle at all times so that the cattle will not be without feed. If the cattle run out of feed, they will not eat and, therefore, the cost of gain will increase. To insure that the cattle have feed before them at all times, HFC feeds the cattle three times per day. HFC also feeds the cattle three times per day because frequent deliveries of feed by feed trucks stimulate the cattle to eat more often and gain faster.

13. HFC makes all the decisions as to formulation of rations, moving the cattle to a higher energy ration, and feeding the cattle in general. HFC would not permit a customer to formulate his own ration for the customer's cattle or decide when to switch rations.

14. Additional care is provided to the cattle by HFC. Water is kept in front of the cattle at all times so that they may drink water whenever they desire. The cattle are given plenty of water because a lack of water will affect the animals' digestion, and they will not digest their foods properly. In addition, it is necessary to clean out the water troughs of the animals frequently. If the animals' water is not clean, they will not digest their food properly. Therefore, HFC cleans the animals' water troughs at least once a day.

15. HFC provides medical care to the animals. HFC gives the cattle all necessary vaccines upon their arrival at the feedlot. The vaccinations reduce the incidence of deaths among the cattle during the time they are kept in the feedyard. In addition, other medical services are provided to the animals. Antibiotics are mixed into the feed fed to the cattle; the antibiotics prevent and control diseases in the cattle, including abcesses in the cattle's liver. Liver abcesses and other illnesses affect the cattle's performance in gaining weight, because the cattle will not eat as much or as well when sick. Moreover, HFC "cowboys" ride the pens and separate sick animals from healthy ones, in order to prevent the spread of disease and in order to treat the sick animals. Whether an animal is sick is determined "by the eye," that is, by making an experienced judgment based upon the appearance of the animal. The sick animals are placed in the hospital pen. Thereafter, they are diagnosed by a Mr. Bob Martin, in consultation with a veterinarian, Dr. Leroy Crum, and placed on a proper treatment program for the particular illness. The medical treatment is important because it reduces death loss of the cattle. Reduction of death loss is important to the overall economic scheme because the customer will, of course, not be able to sell a dead animal for slaughter, and thus will have lost the money he paid in purchasing, feeding and caring for the animal up to its death. Medical treatment is also important because poor health affects the cattle's performance

(they do not eat well when sick) and thus has an adverse effect on the "cost of gain".

16. Other miscellaneous services are provided by HFC. HFC tries to insure that the cattle are not overcrowded in their pens. If the cattle are overcrowded, they will not eat as much nor gain as well. The cost of gain will thereby be adversely affected. It is also important that each animal have adequate feeding trough (manger) space available, for if an animal cannot find room at the trough, it will not eat. The amount of manger space allocated to each animal in a pen is determined by HFC on the basis of past "experience".

17. The cattle should be sold as soon as they become "fat," or "peaked out". When cattle are "fat," "peaked out," or "finished," it means that they have reached their optimum point of weight gain in the feedyard, and are thus ready for sale and slaughter for meat.

18. The determination as to when cattle are "fat" and thus ready for sale is made "by the eye," that is, by the judgment of an experienced cattle feeder after looking at the cattle. At such time, the cattle exhibit a "full flank," a "brisket," and a "tucked up" belly, all as related to the number of days the cattle have been on feed.

19. When the cattle are fat, Mr. Salvador may take meat packing house representatives out to see them, or they may go out on their own to see the cattle. Different packing house representatives require and prefer different sizes and types of cattle and will pay a higher market price for cattle which meet their preferences. From past experience, Mr. Salvador is familiar with the requirements of the different packing representatives, and will take the representative out to see cattle meeting their requirements. Mr. Salvador may then ask a price for the cattle based upon his opinion of the market price for the cattle for that particular day. The representative may accept that bid, or counteroffer. After a final bid is arrived at, Mr. Salvador will call the customer and tell the customer the price bid. The customer will then decide whether to accept the bid or reject it.

20. HFC keeps and maintains all records and accounts pertaining to customers' cattle, the feed fed to the cattle, and the charges, expenses and costs with respect thereto, and renders periodic statements and billings to the customer which set forth the status of their account and an itemization of all charges, costs and expenses (such as for feed, veterinary services, taxes and for the interest charged the customer by HFC by reason of the company's financing of a portion of the purchase price of the cattle) charged to the customer's account by HFC. HFC performed all such services with respect to Plaintiff's cattle and his cattle feeding arrangement with HFC. The Plaintiff made all payments by mail to HFC as the same were billed.

21. HFC has a profit motive in feeding cattle for third party customers. In every instance, the cattle which HFC sells to third party customers to be fed at HFC are owned, in whole or in part, by HFC. Some cattle sales to customers result in profit to HFC if the market price has risen on the cattle after purchase by HFC, because the customer buys at a higher market price than that paid by HFC when it originally purchased the cattle.

22. HFC also receives a profit on the sale of feed to the customer during the cattle feeding program. The feed is marked up by HFC over the market price of the components of the feed. The feed markup gives HFC additional working capital which is used to reduce and defray the fixed costs of operating HFC's feedlot.

23. Since January 1, 1972, HFC has fed cattle for approximately 254 customers. Approximately 194 of the 254 customers were either farmers or persons engaged in some aspect of the cattle industry (e. g., cattle ranchers, cattle brokers). In addition to its other business activities, HFC has fed cattle solely owned by third party customers for at least the last 12 years.

24. In some instances, HFC will agree to finance a portion of the purchase price of the cattle paid by the customer.

25. There is risk to both the customer and HFC. The customer who is financed puts at risk his margin money (the "down payment" difference between the purchase price of the cattle and the amount financed by HFC) plus the costs of care and feeding of the cattle. HFC puts at risk its ability to collect from the customer if a deficit occurs in the customer's account; that is, if the sale of the cattle when fat does not return enough money to pay for what the customer owes HFC (such as the financed portion of the purchase price) at the time of sale.